**STATE of Minnesota, Respondent,**

v.

**Carlene Ann BUSCHKOPF, Appellant.**

**No. C4–84–561.**

Supreme Court of Minnesota.

Aug. 30, 1985.

Michael F. Cromett, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Julius E. Gernes, Winona County Atty., Winona, for respondent.

WAHL, Justice.

Carlene Ann Buschkopf was convicted of first degree murder, Minn.Stat. § 609.-185(1) (1984), and conspiracy to commit first degree murder, Minn.Stat. § 609.175, subd. 2(2) (1984), of her husband, Ted Buschkopf, by shooting. The trial court sentenced her to life imprisonment. She appeals from this judgment of conviction and sentence, contending that the trial court prejudicially erred by admitting certain statements of a co-conspirator and evidence seized in the course of warrantless searches. She also contends that she was denied due process and a fair trial by various trial court rulings. We affirm the conviction.

Shortly before 7:30 a.m. on July 26, 1983, a guest in the Westgate Motel in Winona heard someone calling out for help and called the motel manager. The manager found the defendant lying in the doorway of one of the motel rooms, moaning and asking for help. The manager called for a rescue squad and notified the police. When the rescue squad arrived, one member of the team attended to the defendant, who was complaining of pain in her head and stomach, while the others entered the room and attended to Ted Buschkopf, who was lying on one of the beds unconscious with a gunshot wound to his head. Police officers arrived shortly thereafter.

Officer Ronnenberg arrived at the room around 7:30 a.m. In the doorway, he saw the defendant, shot in the back. He entered the room at the rescue squad's request, and helped remove Ted and place him in the ambulance. He checked over the premises briefly and saw no one else there. He went back to where the defendant was lying twice before she was taken to the hospital. She told him several times that she and her husband had been out the night before and returned late to the motel room. She said that in the middle of the night she had been awakened, saw her husband had been shot, and then felt sharp pains herself. Officers Nyseth and Kauphusman, who arrived at the motel room shortly after Ronnenberg, related similar accounts of the events at the scene.

Officer Nyseth accompanied the defendant to the hospital in the ambulance and, with Officer Fier, a B.C.A. agent, conducted a short interview with her in the emergency room. The defendant gave an account of the events of the previous night similar to that she had given Ronnenberg at the motel. Fier and Nyseth said that she was completely cooperative and coherent at the time. Both had the impression she wanted to assist in the investigation. They admitted that she appeared to be in considerable pain, and the interview ceased in order that she might receive treatment. By 8:00 a.m. the officers who remained at the motel had secured the room and the evidence technician was on the scene.

Throughout the morning and early afternoon of July 26, the defendant was in surgery for removal of a bullet from her abdomen. Between 1 and 2 p.m. that afternoon, police officers reentered the motel room and conducted a full investigative search, seizing many items from the room and taking numerous photographs of the interior. Around 5:00 p.m. Officer Nyseth again spoke to the defendant, now out of surgery. The defendant, when questioned, described what she had been doing the night before, discussed her business relationship with Arthur Lucas, and mentioned that she had a lot of bills. Nyseth said she continued to be cooperative, indicated that she

wanted the perpetrator caught, and asked about the conduct of the investigation. She consented to the swabbing of her hands and gave the officers the night gown she had worn. The officer never told her about the investigative search of the motel room, which was completed between 8 and 9 p.m. that evening. The police reentered the motel room three days later, on July 29, and seized some additional items.

The police also contacted Arthur Lucas, a friend and business associate of defendant's at his home in LaCrosse, Wisconsin on the day of the shooting. He was interviewed by Winona and LaCrosse police officers at the station in LaCrosse. In describing his activities of the previous day and evening, Lucas explained that he had spent the day of July 25 with the defendant, and in the late evening had met with Judy Baker, a bartender and acquaintance. He stated that he had spent the night at Baker's apartment. He also detailed his sexual and business relationship with the defendant, as well as their financial problems.

The officers then asked Lucas for consent to search his apartment and car for a small caliber weapon. Lucas gave his consent to both searches. He guided the officers to his apartment, let them in, and offered them coffee. Lucas took the officers through his home, answering questions about items of interest to them, and expressly consented to the seizure of each item they took from the apartment. The officers noted that there were women's clothing and other items in the bedroom of the apartment. They admittedly searched these items and seized several objects that Lucas identified as belonging to the defendant.

On July 27, the police interviewed Judy Baker at the LaCrosse police station. She initially told the police that she had seen Lucas the morning of the shooting, but her account was different in most details from the account given by Lucas. Soon, however, she told a substantially different tale. She said she first met Lucas in May, 1983. Some time in June of 1983 he began telling

her of the financial problems he and the defendant were having. In mid-July the defendant, who Baker knew by sight only, visited Baker at her home. The defendant also told Baker of marital and financial problems during the visit, but said she hoped to have those problems taken care of soon.

Sometime during the week of July 10, Lucas told Baker that he and the defendant had a plan to get out of their financial problems by "getting rid" of somebody, but that previous attempts to carry out the plan had failed. Lucas also told her that the motive to get rid of this person was to collect insurance money. On July 23, he asked Baker to help him with an alibi and offered her $1,000 if she would be seen with him on a particular evening. Two days later, on July 25, he called her at the bar where she worked, again asked for her help, and said he would be coming by the bar. She hung up and said to Sheila Goplen, a co-worker, "Oh, God, that man is coming up here." He arrived around 7:30 and asked to spend the night with her. She agreed, but said she never saw him again after he left around 9 p.m.

She had received two phone calls from Lucas, however. She said he called her at about 6:30 on the morning of July 26, and said "It's happened, it's over, it's done." He went on to tell her that she should tell the police he had been with her between 5:15 and 5:30 a.m. that morning. She called into work that day, and left word with Sheila Goplen that she couldn't work her shift. Baker had received another phone call from Lucas on the morning of July 27, at which time they discussed alternative alibis.

Baker agreed to assist the police by placing telephone calls from LaCrosse to the defendant and to Lucas which would be recorded. She made the first call to the defendant in the hospital. During that conversation the defendant repeatedly asked Baker to tell Lucas that she "couldn't replace one." After numerous attempts, Baker also contacted Lucas on July 28. They had four conversations that day, each

tape recorded by the police. During the first conversation, Baker relayed the message from defendant. Lucas rehearsed his alibi with Baker, and the two discussed defendant's condition. Baker also attempted to draw Lucas into a discussion of the shooting. He resisted this line of conversation. In the second, very brief conversation, Baker gave Lucas a phone number where he could call her back. During the third conversation, Lucas questioned Baker about what she had said to the police and told Baker that defendant's message meant that she couldn't replace the gun that was used with another gun. He further explained that he had disposed of the gun that was used and that it had been his gun. He also cautioned Baker to be careful about what she said to the police. During the final call, the two discussed their financial problems. Baker asked Lucas for the money he owed her because she had lost her job. Lucas said that the insurance money could not be collected until Ted died.

Subsequent investigation by the police confirmed the deep financial problems alluded to by the defendant and Lucas. In June, 1983, the Buschkopfs' contract for deed on their home was cancelled, and soon thereafter they were evicted from their rental apartment. By the day of the shooting, their debts included $50,000 on a personal note, a tax lien of $4,700, a personal note in favor of Ted's father, and numerous judgments and creditors' claims. Lucas owed more than $82,000 in connection with his business by the day of the shooting, was obliged on additional debts of over $6,000, and was behind on his rent. On the morning of July 25, the defendant and Lucas had virtually no money and were down to 11 cigarettes between them. Ten days before the shooting, the defendant, with Ted's consent, had changed his life insurance policy to make her the primary beneficiary of the $31,000 benefit.

The evidence presented by the State established that the planning of Ted Buschkopf's death had gone on for many weeks and that several attempts had been made on his life before the fatal shooting. In addition to the defendant and Lucas, the participants in these attempts included Pat Balk, Tim Fraley, Peter Fraley, and Tina Skarbeck. The defendant had offered Balk 25% of the insurance money they would collect for her help. One of the attempts became known as the "Shive Road incident," and occurred on the night of June 23, 1983. The defendant had persuaded Ted to drive her down a back road, where they came upon Pat Balk lying in the road. Ted stopped the car to come to her assistance, according to plan. When he stooped over to help her, Lucas and Peter Fraley approached, intending to knock him unconscious with a baseball bat. Fraley couldn't go through with the assault, however. Instead, he walked over to Ted's car, put the bat inside, and told Balk it was over. The defendant, however, wouldn't let Balk get up, and at that point Lucas apparently hit Ted over the head with the bat.

Lucas, also charged with murder in the first degree and conspiracy to commit murder in the first degree, was tried first and convicted of both charges. He did not testify at the defendant's trial and none of the other participants testified that Lucas actually struck Ted. The morning after this incident, however, Ted told a co-employee, Les Jonsgaard, of the "very bizarre" event, and showed Les a bump on his head, which Les felt with his fingers. The defendant's account of the incident was far different. She detailed an extortion scheme perpetrated by Balk and the Fraleys to explain the attempt on Ted's life. She said that when she and Ted stopped on Shive Road, Tim Fraley got in the back seat of the car with a gun and told her that if Lucas wasn't "regular with the payments," she would be killed. She said that Peter Fraley then hit Ted with a bat as he tried to exit the car. Les Jonsgaard testified on rebuttal, however, that Ted had made no mention of a gun in his account of the incident.

The defendant made an effort to secure a gun two days before the shooting. On July 23, she approached Donald Warner at a bar located across the street from Lucas' apartment. During their conversation, she learned that he owned a .22 caliber pistol.

She stated that her son had a birthday on July 26, and that she wanted to borrow Warner's gun to show it to him. Warner demurred and finally left the bar. The boy's father, the defendant's former husband, testified that none of their children had a birthday on the 26th, and that the defendant had given their son a gun for Christmas two years before.

The defendant was arrested on August 1, 1983. One week later Ted Buschkopf died, never having regained consciousness. The trial was originally scheduled to be conducted in Winona, but was later transferred to Rochester upon defendant's request for a change of venue. The court denied a second change of venue motion, as well as several motions for a continuance. After a 25 day trial, the jury found defendant guilty of first degree murder and conspiracy to commit murder.

Defendant raises the following issues on appeal:

(1.) Whether the trial court committed reversible error by admitting statements made by Lucas to Baker and to the police as nonhearsay statements made in the course of and furtherance of a conspiracy;

(2.) Whether the trial court should have excluded tapes of telephone calls made by Baker to Lucas from the LaCrosse police department on grounds of comity because the tapes would have been inadmissible in Wisconsin courts; and

(3.) Whether the trial court erred in admitting evidence seized pursuant to warrantless searches of Lucas' apartment and defendant's motel room; and

(4.) Whether the trial court improperly ruled on various evidentiary objections and other trial motions, thereby denying the defendant's right to due process and a fair trial.

1. The defendant first contends that the trial court erred by admitting into evidence the taped telephone conversations between Lucas and Baker. Since Lucas did not testify at the trial, the defendant objected to Lucas' statements as inadmissible hearsay. The trial court concluded that Lucas'

statements were not hearsay under Minn. R.Evid. 801(d)(2)(E), because they were statements made by a coconspirator during the course of and in furtherance of a conspiracy. The defendant argues that since these conversations were conducted after the shooting, the act culminating the charged conspiracy, they could not have been made in the course of or in furtherance of that conspiracy.

Defendant made the same argument to the trial court. That court determined that the conspiracy continued beyond the shooting, both because a conspiracy to collect the insurance proceeds could be implied, and because the conspiracy continued to encompass acts of concealment. Under either analysis, the court concluded that a conspiracy persisted at the time the conversations occurred, and that Lucas' statements to Baker were in furtherance of both a conspiracy to collect the proceeds and to conceal the murder.

Defendant argues that a continuing conspiracy may not be implied for either purpose. Generally, a conspiracy to conceal the commission of the charged crime may not be automatically implied to permit the use of hearsay statements made by co-conspirators. *Krulewitch v. United States*, 336 U.S. 440, 443–44, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949); *State v. Howard*, 324 N.W.2d 216, 223 (Minn.1982). In *State v. Davis*, 301 N.W.2d 556 (Minn. 1981), we set forth the proper approach for determining whether a conspiracy to conceal existed to permit admission of statements made by coconspirators in that case. We stated that the court should analyze the facts of the case to determine if in fact there was an agreement to conceal, to determine the closeness in time of the concealment to the commission of the principal crime, and to determine the reliability of these statements. *Id.* at 559 (citing *United States v. Mackey*, 571 F.2d 376 (7th Cir. 1978); C. McCormick, *Handbook of the Law of Evidence*, § 267, at 646 (2d ed. E. Cleary 1972)). The statements at issue in *Davis*, made during a discussion among coconspirators to aggravated robbery mo-

ments after the acts constituting the charged conspiracy were complete, related to the necessity of retrieving the coconspirators car from the scene of the crime. The statements were made to a former girl friend of one of the coconspirators. We held that the trial court had not abused its discretion, under those circumstances, by admitting the statements as made in the course of an agreement to conceal. *Compare Mackey*, 571 F.2d at 383 (evidence held admissible where crime had no specific terminating event and conspiracy continued indefinitely) *with Krulewitch*, 336 U.S. 440, 69 S.Ct. 716 (evidence held admissible where conspiracy involved a single, discrete crime, and conversation evidencing agreement to conceal took place over six weeks after crime was committed).

■ The facts of this case manifest an agreement to conceal consistent with the analysis set forth in *Davis*. The conversations took place only 2 days after the shooting, and evidenced an agreement between defendant and Lucas to conceal the murder weapon and an agreement between defendant, Lucas, and Baker to structure alibis. The shooting of defendant herself is circumstantial evidence of an agreement to conceal, which provides independent foundational support for the existence of the concealment plan. *See State v. Black*, 291 N.W.2d 208, 216 (Minn.1980). Further, the statements were made in the belief that Baker was a reliable ally, which enhanced their reliability. Thus, the court reasonably found that concealment was an ongoing aspect of the conspiracy at the time Lucas made the statements, which satisfies the requirement that the statements be made in "the course of" the conspiracy.

■ The trial court also properly concluded that the conspiracy could be characterized as a conspiracy to collect Ted Buschkopf's insurance proceeds, as an alternative ground for finding that Lucas' statements were made while the conspiracy persisted. The court relied on *State v. Howard*, 324 N.W.2d 216 (Minn.1982), in reaching this conclusion. In *Howard*, we applied the rule that when an integral act

connected with the main objective of the conspiracy remains undone, the conspiracy remains alive. *Id.* at 223–24. In that case, the charged crime was conspiracy to commit murder, but the court found that a "murder for fee" arrangement was the principal motive for its commission. The conspiracy was thus viewed as ongoing until completed by payment of the agreed sum. In the case before us, although the defendant was charged with conspiracy to commit murder, the trial court found that the object of the conspiracy was to collect the proceeds of Buschkopf's insurance. The record in this case is replete with testimony supporting the trial court's finding. Since the proceeds were never collected, the trial court properly ruled, consistent with *Howard*, that the statements of the coconspirators were made in the course of the conspiracy.

■ For these statements to have been properly admitted, however, they must also have been made "in furtherance" of the conspiracy. This requirement is met if the statements were designed to promote the common good of the conspirators. *Howard*, 324 N.W.2d at 223; *see Mackey*, 571 F.2d at 383 (standard is whether "some reasonable basis exists for concluding that the statement furthered the conspiracy"). Defendant asserts that since the "vast majority" of the statements made were simply narrative statements of what happened the night of the shooting, they cannot be considered to have been in furtherance of the plan.

■ This description of the conversation is accurate only in part. The transcript of the conversations reveals that Lucas and Baker also rehearsed Lucas' alibi. Regardless of whether the conspiracy is viewed as one to collect insurance or to conceal the murder conspiracy, these statements meet the "furtherance" test. In *State v. Berrisford*, 361 N.W.2d 846 (Minn.1985), we stated that when a conspiracy to conceal is at issue, statements creating the alibi are in furtherance of the conspiracy. *Accord State v. Daniels*, 361 N.W.2d 819 (Minn. 1985). Since detection of murder by the

beneficiary would also defeat a claim to the insurance proceeds, Lucas' alibi statements similarly promoted the "common good" of the conspiracy to collect the proceeds. Under either theory of the nature of the ongoing plan, then, we hold that Lucas' statements were probative evidence properly admitted by the trial court.

Defendant also claims that Baker's account of her telephone conversation with Lucas the morning of the shooting and Lucas' statement to the police are also inadmissible hearsay. We disagree. Since the conspiracy was ongoing at the time these statements were made, these statements, too, meet the requirements of the co-conspirator rule. The conversation with Baker concerned the details of Lucas' alibi; similarly, Lucas' statements to the police were in response to their questions about his whereabouts on the night of the shooting, and his relationship with defendant. For the reasons set forth above, we hold that these statements were properly admitted.

2. Defendant contends that if the tapes of Baker's calls to Lucas are not excluded on hearsay grounds, they should have been excluded on comity grounds. Defendant bases her comity argument on the fact that the tapes would have been inadmissible in a prosecution in Wisconsin under the Wisconsin Electronics Surveillance Control Law, Wis.Stat.Ann. §§ 968.27–.33 (1982). The Wisconsin Act requires intercepted communications to be obtained pursuant to a warrant if the prosecution seeks to have the tapes admitted at trial. *State v. Smith*, 72 Wis.2d 711, 242 N.W.2d 184 (1976); *State ex rel. Arnold v. County Court of Rock County*, 51 Wis.2d 434, 187 N.W.2d 354 (1974). In Minnesota, by contrast, tapes of intercepted conversations are admissible if the consent of one party to the conversations is obtained. Minn.Stat. § 626A.02, subd. 2(d) (1984). The defendant argues that to permit these tapes, obtained without a warrant in Wisconsin with the assistance of Wisconsin police officers, to be admitted in evidence in a Minnesota pro-

ceeding unduly interferes with Wisconsin's legislative policy. Thus, she argues that transcripts of the tapes should have been excluded.

We find that defendant's comity argument but thinly veils a conflicts question, which is how the trial court treated it. We have discussed this issue at length in *State v. Lucas*, 372 N.W.2d 731, 735–737 (Minn.1985), and there decided to use an exclusionary rule analysis rather than a traditional conflicts of law approach to determine the admissibility of evidence obtained in another state. *Lucas*, at 737. The Minnesota and Wisconsin police officers who taped the conversations did not violate the laws of either state. We concluded in *Lucas*, and conclude here, that exclusion of the tapes would not have served to deter misconduct by the police officers in either state. We hold that the trial court properly admitted transcripts of the tape recordings into evidence.

3. Defendant sought to exclude, as fruits of a warrantless search, items which she claims were her personal belongings or seized from her private living area in Arthur Lucas' apartment. It is undisputed that the search and seizure were conducted without a warrant and were therefore per se unreasonable under the Fourth and Fourteenth Amendments, unless the police conduct was justified under an established exception to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Hanley*, 363 N.W.2d 735, 738 (Minn.1985). The state contends, and the trial court agreed, that the search and seizure of defendant's possessions fell within the exception permitting third persons to consent to searches and seizures of items over which the third person has "common authority." *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *State v. Martin*, 261 N.W.2d 341

(Minn.1977).[1] The defendant contends that Lucas did not have common authority over her personal items stored in the apartment, or found in areas exclusively used by her, and therefore the search of these areas and items exceeded the permissible scope of the consent given.

■■■■ The merit of defendant's argument turns wholly on whether Lucas did or did not exercise such "common authority" over the challenged evidence. In *Matlock,* the United States Supreme Court defined the term as follows:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies third party consent does not rest upon the law of property, with its attendant historical and legal refinements * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7. In applying this definition, a finding of "mutual use" is the essential ingredient of effective consent. Furthermore, an independent right by the third person to inspect, and an assumption of risk of possible inspection by the defendant, must be reasonably inferrable from that mutual use for the exception to attach.

■■■ Only two of the items seized from Lucas' apartment were admitted into evidence at trial: a list of the Buschkopfs's financial obligations found in a wastebasket in the kitchen of the apartment, and a note found in Lucas' shaving kit which defendant had given Lucas for safe-

keeping. There is no question that Lucas had common authority over the list. The officers testified that Lucas' own handwriting was on the list. Lucas also told the police that he and defendant had jointly discussed the items on the list, both of them annotating the list as they went along. By sharing the information with Lucas, defendant permitted "mutual use" of the list with Lucas sufficient to support the finding that Lucas exercised common authority over it.

■■■ Whether Lucas had common authority over the note defendant gave him is a closer question. The officers testified that Lucas told them that defendant had given him the note with specific instructions not to look at it but to hold it for safekeeping. This court has never decided whether such express instructions may limit a third party's authority over an item placed in the third party's possession. Cases from the federal courts, however, suggest that the third party's authority to consent to a search of property left by the owner in that party's possession may be limited when the owner has taken physical precautions against intrusion by the third party. *Compare United States v. Presler,* 610 F.2d 1206 (4th Cir.1979) (search was invalid where defendant retained keys to locked briefcases left with friend); *with United States v. Sellers,* 667 F.2d 1123 (4th Cir.1981) (search was valid where defendant gave free access to all effects left with friends); *see also United States v. Selberg,* 630 F.2d 1292 (8th Cir.1980) (where defendant asked neighbors to "watch" home, but did not give them keys, neighbors had no power to consent to search of home). The dispositive factor is whether the defendant would reasonably expect to retain control and privacy over the effects *vis-a-vis* the third person. In this case, while defendant asked Lucas not to look at the note, she

---

1. For such consent to be valid, the state must show that the third party gave consent voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); *State v. Hanley,* 363 N.W.2d 735 (Minn.1985). There is no dispute that Lucas' consent was freely given, when, as here, he gave both oral and written consent to the search, accompanied the officers to his home, let them in, offered them coffee, guided them through the apartment, gave detailed explanations of each item as requested by the officers, and expressly consented to the seizure of each item removed by the police.

apparently did not seal it or otherwise physically prevent Lucas from looking at it. Moreover, the facts surrounding the conspiracy indicate an agreement to cooperate with the investigation, further diminishing defendant's reasonable expectation that Lucas would not disclose the note to the authorities. Under these circumstances, Lucas' consent was effective to permit the seizure of the note. We hold, therefore, that the items belonging to defendant which were seized from Lucas' apartment and introduced at trial were properly admitted.

4. Defendant next challenges the admission of evidence seized pursuant to warrantless searches of her motel room on the afternoon of the shooting, and on the subsequent re-entry three days later. The trial court found that she had given her tacit consent to those searches and deemed all evidence seized admissible. The trial court reasoned that defendant's apparent cooperativeness with the police throughout the day of July 26, her failure to object to the initial entry by the police, and her status as a presumed victim on that day manifested sufficient consent to the search, even though at no time did the officers ever expressly request consent nor did she affirmatively give it.

This court has held in several cases that tacit consent may be sufficient to justify a warrantless search. Recently, in *State v. Howard*, 324 N.W.2d 216 (Minn. 1982), we deemed consent to search had been given when the defendant called the police to the homicide scene, and invited them in, and when it could be "reasonably inferred from the testimony [that he] expected and desired that the police search for weapons and other evidence." *Id.* at 224. Similarly, in *State v. Hyleck*, 286 Minn. 126, 175 N.W.2d 163 (1970), consent was found when the defendant had his house keys delivered to the police to search for a murder weapon; and, in *State v. Thompson*, 273 Minn. 1, 139 N.W.2d 490 (1966), when the defendant suggested to the police that they go to the basement of his home to see if money had been taken to

determine if robbery had been the motive for his wife's homicide. *Accord State v. Kotka*, 277 Minn. 331, 152 N.W.2d 445 (1967). In none of these cases was consent to search either expressly requested by the police or expressly given by the defendant; rather, consent was inferred from the defendant's participation in summoning the police, cooperating with the investigation, and exhibiting some affirmative act or intent that the police conduct the search.

This case is in key respects distinguishable on its facts from the cited decisions, even though each of those factors is reasonably supported by the evidence before the trial court. Defendant's initial acquiescence to the search was given while she was lying in a doorway bleeding from a gunshot wound. In none of the cases cited was the defendant injured or otherwise incapacitated at the time the police were summoned or consent given. Moreover, during the interviews the police conducted with the defendant throughout the day, she was observably in considerable pain. Thus, her failure to object to or limit the scope of the motel room search may be less indicative of a tacit agreement to permit the search than of an inability to focus on the events taking place. Further, she did not observe the investigative search conducted while she was in surgery so as to put her on direct notice that she should object if moved to do so. Finally, she was asked for her consent to the seizure of her nightgown and to the taking of a blood sample and a neutron activation test, which may reasonably have suggested to her that her consent would be expressly requested for any search or seizure. Under these circumstances, it is unreasonable to conclude that she had given tacit consent to search the room.

The evidence seized from the room is, however, otherwise admissible under the plain view exception to the warrant requirement. Under this exception, evidence is validly seized when it was in plain view, there was a prior justification for an intrusion, the discovery was inadvertent, and there was probable cause to believe that

the items seized were immediately apparent evidence of crime. *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *State v. Streitz,* 258 N.W.2d 768 (Minn.1977). In this case, the officers' initial entry was justified to administer aid to Ted Buschkopf and to see if a perpetrator might be on the premises. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). As to the "plain view" requirement, the physical evidence admitted at trial, namely, the bed clothing, pillows, telephone, window screen, and items on the nightstand, would have been plainly visible to the officers assisting the rescue squad in removing Buschkopf and in determining whether a perpetrator was present. The only other items seized from the room and admitted into evidence were photographs taken of the room's interior. In *State v. Fulford,* 290 Minn. 236, 187 N.W.2d 270 (Minn.1971), this court held that photographs of items in plain view are admissible if the officers were legitimately on the premises. Finally, the "apparent evidence of crime" requirement seems met here, since each of these items could assist the officers in linking suspects to the scene of the crime. Thus, even without the consent of the defendant, we hold that the items seized in the motel searches were validly seized under the plain view exception and properly admitted into evidence.

5. The defendant lastly contends that the trial court committed a number of other errors which, taken together, were so prejudicial as to constitute a denial of her rights to due process and a fair trial.

First, defendant argues that the trial court erred in denying her motion for a second change of venue, the first motion having resulted in a change of venue to Olmsted County. Defendant claims that the responses of the jury panel during voir dire indicated that they had heard information on the case and that, under these circumstances, it was unlikely that the trial could be heard by a fair and impartial jury in Olmsted County.

 It is well settled that while pretrial publicity may prejudice a defendant's right to a fair trial, a defendant in a criminal trial has the burden of showing actual jury prejudice by the publicity. A simple admission by a juror that he or she has been exposed to pretrial publicity is insufficient to show prejudice. *State v. Kinsky,* 348 N.W.2d 319, 323 (Minn.1984). The test is whether a prospective juror can set aside an impression or opinion and render an impartial verdict. *Id.* In denying defendant's motion, the trial court noted that no seated juror was challenged for cause, and that the defense used only 12 of 15 permitted peremptory challenges. It is clear from these facts that the defendant was satisfied with the jury as selected, and therefore cannot be heard to assert the necessity of a venue change. We hold that the trial court properly denied the second change of venue motion.

 Defendant also challenges the trial court's denials, on three separate occasions, of her motions for continuance. She first argues that her motion made the day jury selection commenced, requesting a transcript of portions of the Lucas trial, was an implied motion for a continuance until the transcript was prepared, and that this motion was improperly denied. Even assuming that an "implied motion" could be inferred, *see* Minn.R.Crim.P. 32 (motion shall set forth the relief or order sought), the defendant's claim is without merit. The decision to grant or deny a motion for continuance lies within the discretion of the trial court and may be disturbed on appeal only on a showing of abuse of discretion. *State v. Turnipseed,* 297 N.W.2d 308, 311 (Minn.1980); *State v. Beveridge,* 277 N.W.2d 198 (Minn.1978). Abuse of discretion may be found if, in light of the circumstances before the trial court at the time the motion was made, the court's decision prejudiced the defendant by materially affecting the outcome of the trial. *Turnipseed,* 297 N.W.2d at 311.

 We find no abuse of discretion under the facts of this case. The defendant made no showing of prejudice, and the trial

court made all efforts to lighten any burden she may have suffered by not having the transcript in hand. The court ordered that the state produce whatever portion of the Lucas transcript was then available, with leave to the defendant to renew her request for additional portions which she believed material to her case as they were prepared.

Defendant also challenges the trial court's denial of a second motion for continuance based on pre-trial publicity. Whether the trial court has abused its discretion in such a case depends on whether the court properly assessed the likelihood that prejudicial publicity would affect the impartiality of the jurors and thereby prevent a fair trial. *State v. Morgan*, 310 Minn. 88, 95, 246 N.W.2d 165, 169 (Minn. 1976). A continuance should be granted if there is a "reasonable likelihood that in the absence of such relief, a fair trial cannot be had." *Id.* (quoting A.B.A. Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (Approved Draft, 1968) § 3.2(c)); *see State v. Rieck*, 286 N.W.2d 724 (Minn.1979). On this record, it cannot be said that the court abused its discretion in denying the motion. No evidence was submitted showing the nature of the pretrial publicity, the statements of jurors on voir dire, or even speculations by counsel as to the temper of the community at the time of trial.

Defendant further contends that she should have been granted a continuance during the third week of trial, when defendant learned that the state intended to use a letter she had written to Lucas when both were in jail. The letter contained very damaging statements concerning defendant's relationship with Lucas and her concern that they "get the facts straight" for their upcoming trials. The trial court permitted the letter to be used by the state for impeachment purposes, and denied defendant's requested motion for a continuance to prepare, despite defendant's argument that the letter came as a surprise and would affect whether she would testify in her own behalf.

While the defendant's case was no doubt damaged by the impeachment value of the letter, she had known of the existence of the letter, and the prosecution's interest in securing it and using it for some purpose at trial, for one week before the motion for a continuance was made. Since the only claim of prejudice was surprise, the trial court could reasonably have concluded that any adversity occasioned by surprise could have been met in the intervening week especially in light of the fact that the letter was not used as substantive evidence. We hold that the trial court did not err in denying the three motions for continuances.

Defendant also claims error in the admission into evidence of two guns on the grounds of relevancy and prejudice. We are not persuaded by defendant's arguments. Relevant evidence is any evidence having "any tendency" to make a material fact more or less probable than it would be without the evidence. Minn.R.Evid. 401. Physical evidence is admissible if it connects the defendant with the crime, but inadmissible if submitted to only create suspicion. *State v. Gayles*, 327 N.W.2d 1, 2 (Minn.1982) (citing *State v. Webber*, 292 N.W.2d 5 (Minn.1980)). One of the guns admitted was a .22 caliber semi-automatic rifle owned by Lucas and furnished to the police by Lucas' wife. It was not the murder weapon, but there was testimony at trial supporting the inference that it was the gun sent to Cindy Lucas to replace the .22 rifle used in the murder. The gun therefore connected defendant with the crime.

The second gun admitted was a rifle owned by defendant's son which, the boy's father testified, the son had received as a Christmas gift from defendant and Ted two years prior to the trial. It was offered by the state to show that, when defendant asked Donald Warner where she might obtain a gun for her son shortly before the murder, she was in fact looking for a gun to commit the crime, since she had already given her son a gun. The

evidence was probative of her connection with the conspiracy to murder her husband.

It is defendant's contention that a weapon may be admitted only if it was the murder weapon. In *Webber*, and again in *State v. Marquetti*, 322 N.W.2d 316 (Minn.1982), however, we deemed admissible weapons not used in the commission of the crime but which were otherwise probative. In *Webber*, a weapon was admitted as probative evidence of a murder conspiracy where the coconspirators had transferred other guns, and the defendant had showed guns around. *Webber*, 292 N.W.2d at 9. In *Marquetti*, a weapon owned by the defendant was admissible which was identical to the murder weapon, since the evidence was probative of the defendant's "weapon of choice." *Marquetti*, 322 N.W.2d at 317–18. Thus, the fact that the guns admitted here were not the weapons used in the commission of the crime is not dispositive of their relevance. We hold that both guns were properly admitted.

Finally, defendant claims it was error for the trial court to admit certain hearsay statements made by Les Jonsgaard and Sheila Goplen. We find no error.

The limited testimony by Les Jonsgaard, a co-employee of Ted's, narrating Ted's account of the Shive Road incident was admissible under the residual exception to the hearsay rule applicable when the declarant is unavailable. Minn.R.Evid. 804(b)(5). The statement had circumstantial guarantees of trustworthiness, was offered as evidence of a material fact, was more probative on the point than any other evidence that could reasonably be procured, and served the interests of justice and the purposes of the rule. *State v. Daniels*, 361 N.W.2d 819 (Minn.1985); *State v. Langley*, 354 N.W.2d 389, 398 (Minn.1984). Later in the trial, the court permitted Jonsgaard to return to the stand to rebut defendant's testimony that a gun had been used in the assault. When questioned as to whether Ted had stated that a gun was present on the scene, he answered no. If this testimony had been offered to prove the truth of the matter asserted, that is, that no gun was used, the hearsay challenge would perhaps have merit. However, the evidence was offered for impeachment purposes, and thus falls outside the hearsay rule altogether.

Defendant further claims it was error for the trial court to admit, under the excited utterance exception of the hearsay rule, Minn.R.Evid. 803(2), two statements made by Baker to a co-worker, Sheila Goplen. For a statement to qualify as an excited utterance, three requirements must be met:

1. There must be a startling event or condition;
2. The statement must relate to the startling event or condition; and
3. The declarant must be under a sufficient aura of excitement caused by the event or condition to ensure the trustworthiness of the statement.

Minn.R.Evid. 803(2) 1977 Committee Comment; *see State v. Taylor*, 258 N.W.2d 615, 621 (Minn.1977).

We hold that both of Judy Baker's statements to Sheila Goplen were properly admitted. The first statement was her exclamation, after receiving a call at the Lakeview Bar on July 23, "Oh my God, that man is coming up here." An unsettling phone call has been held to be a startling event sufficient to satisfy the first requirement of the rule. *United States v. Earley*, 657 F.2d 195, 198 (8th Cir.1981). Baker's statement appears to have been elicited by the caller's message. She made the statement immediately after hanging up the phone and was under a "sufficient aura" of excitement to ensure its trustworthiness.

The second challenged statement was Baker's statement to Goplen on the afternoon after the murder that she wouldn't be able to come to work that day. This statement was not hearsay, because not admitted to prove the truth of the matter asserted, but rather to suggest that Baker was agitated or upset. *See* 11 Min-

nesota Practice: Evidence § 803.03 (1979). Therefore, defendant's challenge to the admissibility of these statements fails.

Finding none of the errors claimed by the defendant to be meritorious, we hold that she was not denied her a right to due process and a fair trial by these rulings of the trial court. The conviction is affirmed.

Affirmed.