**STATE of Minnesota, Appellant,**

v.

**Richard A. MIGGLER, Respondent.**

**No. C6–87–1810.**

Court of Appeals of Minnesota.

Feb. 2, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas Foley, Ramsey Co. Atty., Clayton M. Robinson, Jr., Asst. Co. Atty., St. Paul, for appellant.

Earl Gray, Mark Nyvold, St. Paul, for respondent.

Heard, considered and decided by HUSPENI, P.J., and PARKER and LOMMEN *, JJ.

## OPINION

PARKER, Judge.

Respondent Richard Miggler was charged with violating Minn.Stat. §§ 609.-342, subd. 1(h)(v); and 609.343, subd. 1(h)(v) (1986), for allegedly engaging in multiple acts of sexual penetration and sexual contact with four-year-old A.G. At the Rasmussen hearing, the trial court ruled that Miggler's footlocker and its contents seized from Miggler's apartment in a warrantless search were inadmissible. The state appeals, arguing that no "search" took place because Miggler's reasonable expectation of privacy in those items was first frustrated by private parties. We affirm.

## FACTS

Following an argument on May 3, 1987, Miggler directed Candice Grealish and her three children, including A.G., to move out of the apartment they shared. Grealish's understanding was that she had until May 15 to remove her belongings. Miggler testified that he gave her no such permission. Although she routinely split the rent with Miggler, Grealish paid no rent for May.

On May 9, while Miggler was not at home, Grealish entered the apartment, without Miggler's permission, to remove her possessions. Her former husband, Michael Grealish, and her two brothers, Tom and Mark Brown, accompanied her. Mark spied Miggler's footlocker in a bedroom closet that Grealish and Miggler had shared. Grealish told her brother Mark that the footlocker was not hers and that he should not open it. Mark nevertheless opened the footlocker with a key he had. Inside, he discovered several magazines allegedly containing child pornography.

After Mark revealed his discovery and after personally viewing one magazine, Michael Grealish telephoned the police and reported that St. Paul police Sergeant James Charmoli was investigating a sexual abuse case involving his daughter and that he had found some child pornography that Charmoli might want to see. Candice Grealish testified that after her brothers showed her one magazine, she became upset and left the apartment with the children.

St. Paul police officer Gregory Mercado arrived at the apartment 15–30 minutes later. Mercado testified that Michael Grealish first approached him, explaining that he had found pornographic material, and that Candice Grealish and one of her brothers led him to the bedroom. Candice Grealish testified, however, that she was not there when Mercado arrived and that it was not until her brother telephoned her did she return and sign a "consent to search" form.

Mark Brown testified that he opened the footlocker for Mercado, and the trial court found that the footlocker was closed when Mercado arrived. Mercado testified to the contrary. He also testified that the people at the scene told him the footlocker contained children's underwear and child pornographic magazines. Other testimony indicates the witnesses were not that specific.

After allegedly seeing "some type of pornographic material" and "underwear items" in the open footlocker, Mercado spoke on the telephone with Charmoli. Knowing that the children had moved out of the apartment and that the apartment was Miggler's, Charmoli advised Mercado to obtain a consent to search form from

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Candice Grealish. Mercado claims he seized the footlocker after getting the consent form signed and then took the footlocker to the police station and inventoried its contents. The footlocker contained various items related to Miggler's service in the Navy; photos, slides and negatives; *Playboy* and *Penthouse* magazines; numerous women's undergarments; three magazines entitled *Nudist Moppets, Pre-Teen Sexuality* and *Little Girls;* and one pair of children's underwear.

## ISSUES

1. Did the trial court properly suppress the footlocker and its contents seized in the warrantless search?

2. Will the suppression of the footlocker and its contents have a critical impact?

3. Did the search and seizure of the footlocker fall within the "plain view" exception to the warrant requirement?

## DISCUSSION

### I

█ An appellate court will reverse the decision of the trial court in a pretrial appeal

> only if the state demonstrates clearly and unequivocally, first, that the trial court erred in its judgment and, second, that unless reversed, the error will have a critical impact on the outcome of the trial.

*State v. Joon Kyu Kim,* 398 N.W.2d 544, 547 (Minn.1987).

█ The state argues that the trial court erred in holding that the warrantless search was unreasonable, because Mercado's actions did not constitute a "search" within the meaning of the fourth amendment. The state claims that "once a private party completely frustrates the defendant's expectation of privacy in an object, and contraband is discovered, a subsequent police re-examination which does not exceed the scope of the private search does not constitute a 'search' for Fourth Amendment purposes."

There appears to be no decisional law in Minnesota addressing whether the fourth amendment, as incorporated into the fourteenth amendment, requires a police officer to obtain a search warrant before conducting a search of contraband previously discovered by private parties. The United States Supreme Court, however, has considered this issue.

In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), employees of a private freight carrier, Federal Express, damaged a package, opened it to examine its contents pursuant to the company's written policy on insurance claims, and found a tube under several pieces of crumpled newspaper. *Id.* at 111, 104 S.Ct. at 1655. The supervisor cut open the tube and found a series of four plastic bags; the innermost bag contained a white powder. The employees then notified the Drug Enforcement Administration (DEA). Before any DEA agents arrived, the employees replaced the bags in the tube and put the tube and newspaper back into the box. A DEA agent then removed the bag from the tube and removed a trace of the white powder. His field test of the powder identified the substance as cocaine. *Id.* at 112, 104 S.Ct. at 1655. The Court stated:

> The initial invasions of respondents' package were occasioned by private action. Those invasions revealed that the package contained only one significant item, a suspicious looking tape tube. Cutting the end of the tube and extracting its contents revealed a suspicious looking plastic bag of white powder. Whether those invasions were accidental or deliberate, and whether they were reasonable or unreasonable, they did not violate the Fourth Amendment because of their private character.
>
> The additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search.

*Id.* at 115, 104 S.Ct. at 1657 (footnote omitted).

The Court held that the removal of the tube from the box and bags from the tube

did not constitute a "search" within the meaning of the fourth amendment, because it infringed no legitimate expectation of privacy. *Id.* at 120, 104 S.Ct. at 1660. In reaching its holding the court considered the following factors: (1) the employees had just examined the package and, of their own accord, invited the agents to "their offices for the express purposes of viewing its contents;" (2) the agent's inspection was coextensive with that of the employees; (3) there was a virtual certainty that the package contained contraband and little else; (4) the package remained unsealed. *See id.* at 119–21, 104 S.Ct. at 1659–60.

Assuming that the *Jacobsen* rule may be applied in Minnesota, that rule is a great deal narrower than urged here. There are several factual distinctions between this case and *Jacobsen.*

### Search Conducted in Home

In *Jacobsen* the initial invasion of the package took place in the third parties' *own offices,* not the defendant's *home.* In no setting

> is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their * * * houses * * * shall not be violated."

*Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980).

### Non-bailee Situation

The bailee possession in *Jacobsen* gave the defendant a considerably lower expectation of privacy than Miggler had in his *locked* footlocker located in his bedroom closet. Miggler had not risked unauthorized disclosure of his private effects by entrusting his footlocker to anyone or giving anyone permission to open it. *Cf. Jacobsen,* 466 U.S. at 117, 104 S.Ct. at 1658 (when person reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities).

### Unlawful Invasion

The Federal Express employees' initial search was conducted lawfully pursuant to their company's policy on insurance claims. Mark Brown, however, arguably trespassed by breaking into the footlocker, *see* Minn.Stat. § 609.605, subd. 1(6) (1986).

### Exceeded Scope of Search

The agent in *Jacobsen* did not go beyond the scope of the private search. Here, the private parties had examined only a few items in the footlocker prior to the police's search. The police went farther in their search, removed the footlocker from the apartment and later thoroughly inventoried its entire contents. The "consent to search" form signed by Candice Grealish does not alter our conclusion. Use of the form appears to have been a subterfuge; Charmoli knew two days earlier that the children had moved out of Miggler's apartment and that their mother, Candice Grealish, was at least planning to do so. Further, in *Jacobsen* there was no evidence that the invasion was at the direction of the authorities. Here, we may reasonably infer from the record that Mercado participated in the search (i.e., the reopening of the footlocker). The trial court did not, however, ground its ruling on this factor, nor do we.

### Retained Residual Expectation of Privacy

The container searched and seized in *Jacobsen* was virtually certain to contain "contraband and little else." *Jacobsen,* 466 U.S. at 121, 104 S.Ct. at 1661. Here, the footlocker contained much more than contraband (e.g., several items from Miggler's Navy service). Presumably, Miggler retained some residual expectation of privacy in those items which was not vitiated by the private search.

The *Jacobsen* Court suggested that the type of situation present here would violate the fourth amendment. Justice White, concerned about the Court's holding, stated:

> If a private party breaks into a locked suitcase, a locked car, or even a locked

house, observes incriminating information, returns the object of his search to its prior locked condition, and then reports his findings to the police, the majority apparently would allow the police to duplicate the prior search on the ground that the private search vitiated the owner's expectation of privacy.

*Id.* at 132, 104 S.Ct. at 1666 (White, J., concurring in the judgment). The Court, however, explicitly rejected White's characterization of its holding, stating:

We reject Justice White's suggestion that this case is indistinguishable from one in which the police simply learn from a private party that a container contains contraband, seize it from its owner, and conduct a warrantless search which, as Justice White properly observes, would be unconstitutional. Here the Federal Express employees who were *lawfully* in possession of the package *invited* the agent to examine its contents; the governmental conduct was made possible only because private parties had compromised the integrity of the container * * *. A container which can support a reasonable expectation of privacy may not be searched, even on probable cause, without a warrant.

*Id.* at 120 n. 17, 104 S.Ct. at 1660 n. 17 (emphasis added, citations omitted).

The facts which prompted the trial court to rule that the search and seizure of the footlocker was unreasonable fit exactly within footnote 17. Miggler's expectation of privacy continued after the private search. The closed footlocker was located in his home, and he had not relinquished it to a bailee with a lawful right to inspect it. The police search exceeded the private search and extended to the warrantless search and seizure of non-contraband items in which Miggler maintained a reasonable expectation of privacy.

## II

■ Critical impact exists in those cases where the lack of the suppressed evidence significantly reduces the likelihood of successful prosecution. *Joon Kyu Kim,* 398 N.W.2d at 551. It does not exist when the prosecution cannot first show that the suppressed evidence would be admissible.

In this trial, the footlocker and its contents do not appear to be admissible. The suppressed evidence cannot corroborate the testimony of the alleged victim as in *State v. Hanson,* 355 N.W.2d 328 (Minn.Ct.App. 1984). In *Hanson* the trial court suppressed sexually oriented magazines that the child victim had described. In reversing the trial court, this court found, first, that the seizure was valid and, second, that the state met its burden of showing critical impact. This court noted that, without the magazines, the *only* evidence in the case would be the testimony of a nine-year-old child and that the magazines she described might assist the jury in determining her credibility. *Id.* at 329. In this case, on the other hand, the alleged victim cannot testify to the existence of any of the items found. Evidence that these items were seized cannot therefore enhance her credibility. Additionally, nothing in the footlocker is direct evidence that Miggler sexually abused A.G.

The state's apparent goal is to offer the evidence to show that Miggler had a propensity to abuse children sexually. The evidence is inadmissible for that purpose under the guise of *Spreigl* evidence, *see State v. Spreigl,* 272 Minn. 488, 139 N.W. 2d 167 (1965), or evidence admissible under Minn.R.Evid. 404(b). *Cf. State v. Loebach,* 310 N.W.2d 58, 65 (Minn.1981) (battering-parent profile inadmissible to show defendant abused baby unless defendant puts character in issue).

■ The state also argues that the exclusion of the evidence will preclude prosecuting Miggler for violating Minn.Stat. § 617.247, subd. 4 (1986), prohibiting the possession of pictorial representations of sexual conduct involving minors. The state has cited no authority for the proposition that foreclosing a *possible* future prosecution constitutes "critical impact." The possibility that it may later charge him with such a violation is too speculative a basis for finding a critical impact in this prosecution.

## III

■ The state also argues that the seizure of the child pornography magazines

fell within the "plain view" exception to the warrant requirement.

Under the plain view exception to the warrant requirement, evidence is validly seized when (1) it is in plain view, (2) there is a prior justification for an intrusion, (3) the discovery is inadvertent, and (4) there is probable cause to believe that the items seized were immediately apparent evidence of crime. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *State v. Buschkopf*, 373 N.W.2d 756, 768–69 (Minn.1985).

We reject the state's argument. With respect to (2), it is doubtful that Mercado was lawfully in the apartment when he initially observed the magazines. Michael Grealish, who called the police, had no authority to admit them. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (consent to warrantless search may be given by one who possesses "common authority over or other sufficient relationship to the premises" sought to be searched); *Buschkopf*, 373 N.W.2d at 767. Ordinarily, a mere guest on premises may not give consent to search the premises when his or her interest is inferior to that of the host. *State v. Hatton*, 389 N.W.2d 229, 233 (Minn.Ct.App. 1986), *pet. for rev. denied* (Minn. Aug. 13, 1986).

More important, the magazines were hardly discovered inadvertently or in plain view. The inadvertence requirement is not essential when the primary motivation for entering the place is something other than the seizure of the evidence. *State v. Smith*, 261 N.W.2d 349, 352 (Minn.1977). However, Mercado went to the apartment with the sole purpose of looking for the magazines, and the footlocker was closed and its contents concealed when he arrived.

### DECISION

Affirmed.