## Commonwealth *vs.* Joseph M. Morrison.

Hampshire. April 8, 1999. - May 4, 1999.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.

*Constitutional Law,* Search and seizure, Privacy. *Search and Seizure,* Expectation of privacy, Exigent circumstances. *Privacy. Protective Order.*

Evidence flowing from police officers' warrantless entry into and search of an apartment in which the defendant was present was properly admissible, where the defendant, the subject of a protective order forbidding his presence on the premises, had no cognizable privacy interest in the apartment in question [513-514], and where, in any event, the entry and search were justified by exigent circumstances, viz., the officers' reasonable belief that defendant was in the apartment of the woman whom the order against him was intended to protect [514-516].

Complaint received and sworn to in the Northampton Division of the District Court Department on May 23, 1997.

A motion to suppress evidence was heard by *W. Michael Ryan*, J.

An application for an interlocutory appeal was allowed by *Greaney*, J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the matter from the Appeals Court.

*Cynthia M. Pepyne*, Assistant District Attorney, for the Commonwealth.

*Malcom B.E. Smith* for the defendant.

Fried, J. The Commonwealth appeals from an order of a District Court judge allowing the defendant's motion to suppress all evidence seized during a warrantless entry into the apartment of a third party in which the defendant was present. We reverse the allowance of the motion to suppress because the defendant did not have a cognizable privacy interest in the apartment in question and, in any event, the search was justified by exigent circumstances.

I

On May 23, 1997, three officers of the Amherst police depart-

ment responded to a report of a shouting match at the residence of Jamie Daniels.[1] They were advised that there was a history of domestic problems between Daniels and one Joseph Morrison which, at Daniels' request, had resulted in the issuance of a protective order against Morrison. The officers knocked at the door and it was answered by Daniels. Daniels, who was nine months pregnant with Morrison's child, appeared upset, and the officers asked her to step into the hallway. In a conversation with one of the officers, she admitted that she had had a loud discussion with the man in the apartment, but denied that the man was Morrison. She further stated that there had not been a physical altercation and that she did not wish to have the police there. While this discussion was taking place, another officer entered the apartment and spoke to the man inside. The man identified himself as Morrison. Morrison disclaimed any knowledge of the protective order.[2] The police advised Morrison of the order and told him that he would be arrested if he made any contact with Daniels while the order remained in force. Daniels stated that she would vacate the order in the morning. The officers then left, taking Morrison away from the scene with them and advising him to stay away from Daniels as long as the order was in effect.

At 3:43 A.M., the same officers returned to the area to investigate a report of a shouting match between a male and a female in the parking lot at the rear of the building adjacent to that in which Daniels had her apartment. The person reporting the incident told the police dispatcher that the female was pregnant and had entered Daniels' apartment. The officers tried to contact Daniels, both by knocking at her door and by having the station officer telephone her apartment, but received no response. The officers then instructed the dispatcher to contact the apartment manager and request that a keyholder come to the scene so that they might check on Daniels' well-being. The key-

---

[1] The facts are set out in the police report of Officer Charles Nelson of the Amherst police department. Both parties stipulated to the report as an accurate description of the events.

[2] The officers on the scene checked with the station officer who told them that there was no indication that a protective order had ever been served on the defendant. The protective order in issue, while ordering the defendant to refrain from any contact with Daniels, was, in fact, the result of an incident between Daniels and another woman, with whom Morrison lived and had two children. When that woman learned of Daniels' existence she went to Amherst to confront her, but left before the police arrived.

holder arrived at approximately 4 A.M. and unlocked the door but the police were still prevented from entering because the door was chained shut from the inside. The officers once again announced that they were at the door and requested that someone come to the door. Daniels came to the door and the officers told her to unchain it. Daniels hesitated but relented and opened the door for the officers. The police then went into the apartment and found the defendant in the bedroom lying in bed. They arrested the defendant for violation of the protective order.

The defendant moved to dismiss the charge against him (arguing that he could not be charged with violating the order until he had been served with a copy of it) or to suppress all evidence flowing from the warrantless entry and search of Daniels' residence. The motion judge denied the motion to dismiss but allowed the motion to suppress. The judge held that the Commonwealth had not shown that Morrison did not have a cognizable privacy interest in Daniels' apartment and thus that the warrantless search was not justified. The concern for Daniels' safety, although justified, ended once she appeared uninjured and denied the officers' request for entry. The judge also explained that the entry could not be justified based on probable cause that the defendant was in the apartment in violation of the order, as that violation is a misdemeanor. The Commonwealth was allowed to file an interlocutory appeal in the Appeals Court, and we transferred the matter here on our own initiative.

## II

### A

An overnight guest of a lawful occupant has standing to raise privacy claims in respect to a search of that occupant's premises. The touchstone of rights under the Fourth Amendment to the United States Constitution, like those under art. 14 of the Massachusetts Declaration of Rights, is a "reasonable expectation of privacy." *Katz* v. *United States*, 389 U.S. 347, 360 (1947) (Harlan, J., concurring). *Commonwealth* v. *Berry*, 420 Mass. 95, 105 (1995). The Supreme Court has held that "[a] subjective expectation of privacy is legitimate if it is 'one that society is prepared to recognize as "reasonable," ' " and that "status as an overnight guest is alone enough to show that [a person] had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Minnesota* v. *Olson*, 495 U.S. 91,

95-96 (1990), quoting *Rakas* v. *Illinois*, 439 U.S. 128, 143-144 n.12 (1978). The Commonwealth's argument, therefore, that the defendant had no standing because he had no interest in the apartment in which he was a guest by Daniels' invitation must be rejected. Privacy standing is not a real property concept. But that is not the end of the matter.

Although an overnight guest in general may have such an expectation of privacy in the premises as society is prepared to recognize as reasonable, this overnight guest did not. The defendant in this case was the subject of a protective order forbidding his presence on the very premises in which he claims that society should recognize his right to quiet enjoyment. And on the strength of that order he had, just a short time before, been ordered by the police to stay away from that very place. It is simply nonsense to say that society is prepared to recognize his right to be where society by the processes of the law has ordered him not to be. In *Minnesota* v. *Olson, supra,* the police had probable cause to believe that the overnight guest had committed an armed robbery, and the defendant in this case argues that it follows a fortiori that his violation of a protective order, which is a mere misdemeanor, cannot deprive him of standing to raise privacy claims. There would be something to this argument, if the Commonwealth's claim depended on the argument that a person's violation of the law somehow rendered that person an outlaw, making his presence unlawful anywhere but in the custody of the police. But of course that is not the Commonwealth's claim. Even an escaped convict, who might quite appropriately be said to belong nowhere but back in prison, is in a better position than the defendant here. What deprives this defendant of a reasonable expectation of privacy is not his status as a law violator in general, but the fact that he was under a specific and valid legal order not to be in this particular place.

B

Whether or not the defendant had standing to claim a privacy right in the premises, the Commonwealth correctly argues that the police acted reasonably in checking Daniels' apartment to see whether he was there. Finding him there, they were entitled to arrest him. The police were justified in checking the apartment because "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise il-

legal absent an exigency or emergency." *Commonwealth* v. *Hurd*, 29 Mass. App. Ct. 929, 930 (1990), quoting *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978). In justifying action under this doctrine the Commonwealth has the burden of showing, *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 227 (1992), that "the authorities had reasonable ground to believe that an exigency existed, and . . . [that] the actions . . . were reasonable under the circumstances." *Commonwealth* v. *Marchione*, 384 Mass. 8, 10-11 (1981).

In this case the police had very good reason to believe that a person subject to a protective order was in the apartment of the woman the order was intended to protect.[3] That woman was nine months pregnant. And shortly before the arrival of the police on the scene that woman had been seen by witnesses to be engaged in a furious argument with a man whom the police were justified in concluding was probably the defendant. The defendant makes much of the facts that Daniels herself appeared not to want the police in her apartment and so did not appear to want their "protection" against the defendant, that she had told the police she would have the protective order vacated in the morning, and that the order had really been taken out as part of a dispute with another woman with whom the defendant was living. None of these circumstances has any bearing on the reasonableness of the police conduct in entering the apartment and checking to see whether the defendant were there. Unfortunately women who need and seek the protection of protective orders are easily intimidated by those from whom they need protection. See *Commonwealth* v. *Snell*, 428 Mass. 766, 775 (1999) ("The findings necessarily must be evaluated in the context of domestic violence which often calls for rapid police response to prevent further injury to a victim, to see

---

[3]The defendant argues that the police lacked probable cause to believe that he was in the apartment because they relied in part on the information of an unnamed, unknown informant. The report of a disinterested member of the public carries some weight on its own. See *Commonwealth* v. *Welch*, 420 Mass. 646, 652 n.4 (1995) ("Information supplied to the police by citizens is not subject to the same scrutiny as that supplied by unnamed police informants"); *Commonwealth* v. *Carey*, 407 Mass. 528, 534-535 n.4 (1990) (same). Here the report was made after the police had left that very scene not so long before and had established the identity and relation of Daniels and the defendant. In those circumstances for them to conclude from the citizen's report that it was the defendant who had entered Daniels' apartment was reasonable.

whether a threat against a victim has been carried out, or to ascertain whether some other grave misfortune has befallen a victim"); Gender Bias Study of the Supreme Judicial Court at 83 (1989) (finding that battered women "tend to minimize and deny the severity and extent of the abuse"). The police in this case were quite right in not taking at face value Daniels' earlier statements that she would have the order vacated in the morning. They should not be put in the position of second-guessing the continuing need for protection under such an order in the confused and hectic circumstances of a heated encounter. They might rightly be concerned that the assurances she gave them at the door were the result of intimidation by the defendant whom they had reason to believe was lurking within. If they had accepted her statements at face value and turned away, and she had been harmed a short time later, the police might have been criticized for not affording a potential victim the full measure of protection a protective order is intended to provide.

The order suppressing the evidence is vacated and the case is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*