**Alfred H. PAUL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7773.**

Court of Appeals of Alaska.

Oct. 25, 2002.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

---

## OPINION

COATS, Chief Judge.

P.B. went to the Sitka Police Department and told an officer that he had broken into his Uncle Alfred Paul's locked bedroom and obtained a videotape which he watched. He said the tape showed Alfred Paul having sex with C.P., P.B.'s fifteen or sixteen-year-old cousin. The officer watched the videotape and saw the sexual act. The police used information obtained from the videotape to obtain a warrant and ultimately charged Alfred Paul with criminal offenses involving his sexual acts with C.P. Paul moved to suppress the evidence which the police obtained from observing the videotape. He argued that the police violated his rights by observing the videotape without obtaining a search warrant. Superior Court Judge Larry C. Zervos denied Paul's suppression motion and Paul was ultimately convicted of several charges. Paul appeals, arguing that Judge Zervos erred in denying his suppression motion. We affirm.

### Factual background

On the morning of September 12, 1999, nineteen-year-old P.B. informed Sitka Police Officer Dawn Augustus that his uncle, Larry Paul, had sexually assaulted him earlier that morning. P.B. lived in his grandmother's household with his cousin, C.P., and his uncles, Larry Paul and Alfred Paul. After complaining of the assault by Larry Paul, P.B. told Officer Augustus that he had a videotape showing Alfred Paul having sex with P.B.'s fifteen or sixteen-year-old cousin, C.P.

P.B. stated that a few months prior to his conversation with Officer Augustus, he and his cousin Charles had broken into Paul's locked bedroom using a credit card. The bedroom had a "Do Not Enter" sign posted on the door. A videotape was in the VCR, and they turned it on. It showed Paul and C.P. engaging in sexual relations. P.B. said he was disgusted by what he saw and turned the player off. The boys broke into the room on other occasions. Several days before his conversation with Officer Augustus, P.B. broke into Paul's room for the last time.

This time he took a videotape labeled "10/28/98." P.B. said that he had started watching this tape somewhere in the middle. He watched it for a couple of minutes; it showed C.P. and Paul engaging in sexual relations, but it was not the same tape he and his cousin had watched before. P.B. was not specific about the sexual acts depicted on the video, but he told Officer Augustus he was shocked by what he saw. He kept this video by his bed until he took it to the police station the morning he reported being sexually assaulted.

After this conversation, Officer Augustus watched a couple of minutes of the video without rewinding it. She saw a native female performing fellatio on a man.

Sitka Police Detective Teague Widmier became involved in the case at this point. Officer Augustus relayed to Detective Widmier what she had seen on the video and P.B.'s statements. After interviewing P.B., Detective Widmier watched the entire eight-hour videotape—from near the beginning until the end. The tape contained recordings of television commercials and shows in addition to recordings of Paul and C.P. having sex in various ways. Detective Widmier fast forwarded through everything but the sexual acts; viewing the tape in this manner took thirty to forty minutes. Prior to watching the video, he did not ask P.B. how much of the tape P.B. had seen.

After watching the video, Detective Widmier obtained a search warrant for Paul's bedroom and person based on Widmier's assertion that the video depicted sexual acts and P.B.'s hearsay statements.

The police searched Paul's room and person. The search turned up a number of pornographic magazines, videos, and pictures; at least one other videotape taken from the bedroom showed Paul and C.P. having sex. The following day, September 13, 1999, Detective Widmier spoke with C.P. regarding the sex scenes recorded on the videos. That same day, the police arrested Paul.

The State indicted Paul on fifteen counts of unlawful exploitation of a minor,[1] twelve

---

1. AS 11.41.455(a).

counts of incest,[2] and twelve counts of sexual abuse of a minor in the third degree.[3] Paul moved to suppress the fruits of the warrantless search of the videotape. Judge Zervos held an evidentiary hearing, and he denied the motion to suppress. Pursuant to stipulated facts, Judge Zervos found Paul guilty of one count of unlawful exploitation of a minor, one count of incest, and one count of sexual abuse of a minor in the third degree.

### Resolution of the legal issue

The issue before us is whether the police could view the videotape which P.B. brought into the police station without first obtaining a warrant in compliance with the Alaska and United States Constitutions.[4] The resolution of this case is governed by two cases decided by the United States Supreme Court.

In a fragmented decision, *Walter v. United States*,[5] the United States Supreme Court overturned the admission of films of obscene material where the government viewed the films without a warrant.[6] In *Walter*, a shipping company delivered twelve cartons to an incorrect address.[7] Employees of the recipient company opened the packages and found film canisters, the labeling of which indicated they depicted scenes of homosexual activity.[8] The employees attempted to view the film by holding it up to the light but were unsuccessful.[9] They contacted the Federal Bureau of Investigations (FBI), whose agents picked up the cartons and viewed the approximately 900 films using a projector.[10] Justice Stevens, writing for the Court, with whom one other justice concurred, held that the FBI's screening of the films violated Walter's Fourth Amendment rights by expanding the scope of the private search:

[T]he Government may not exceed the scope of the private search unless it has the right to make an independent search. In these cases, the private party had not actually viewed the films. Prior to the Government screening one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search.

. . . .

The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection. Since the additional search conducted by the FBI—the screening of the films—was not supported by any justification, it violated that Amendment.[11]

These two justices suggested that the question remained open whether the government's projection of the films would have infringed on Walter's Fourth Amendment rights if the recipient employees had actually viewed the films before turning them over to the government.[12]

A third justice concurred in the judgment without joining the reasoning.[13]

Justice White, with one other justice joining, concurred with the judgment but stated that even if the private parties had projected the films before turning them over to the FBI, the FBI could have only viewed them

**2.** AS 11.41.450(a).

**3.** AS 11.41.438(a).

**4.** *See* U.S. Const. amend. IV; Alaska Const. art. I, § 14.

**5.** 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

**6.** *Id.* at 652, 100 S.Ct. at 2399.

**7.** *Id.* at 651, 100 S.Ct. at 2399.

**8.** *Id.* at 652, 100 S.Ct. at 2399.

**9.** *Id.*

**10.** *Id.*

**11.** *Id.* at 657–59, 100 S.Ct. at 2402–03 (footnotes and citations omitted).

**12.** *Id.* at 658 n. 9, 100 S.Ct. at 2402 n. 9.

**13.** *Id.* at 660, 100 S.Ct. at 2403 (Marshall, J., concurring).

pursuant to a warrant.[14] He wrote that a subsequent police search without a warrant would permit government agents to conduct warrantless searches of personal property whenever probable cause existed as a result of a prior private search—even where the police could not conduct such a warrantless search when probable cause existed for any other reason.[15] The concurrence concluded that the opening of the packages by the employees destroyed Walter's expectation of privacy to the contents because the contents were left in plain view.[16] However, a private projection of the films would not so destroy the privacy interest in the contents of the films.[17]

Justice Blackmun, with three justices joining, dissented, concluding that Walter had no expectation of privacy remaining in the films once the private employees had ascertained the nature of the films from the depictions on their containers, which were revealed when they opened the packages.[18] Under the dissenting opinion, the FBI did not need a warrant to view the films because viewing the movies on a projector did not change the nature of the private search.[19]

Although the majority opinion in *Walter* is fragmented, because the majority concluded that the evidence should be suppressed, Professor LaFave concludes that "it is clear from *Walter* that a private search does not permit a later government [warrantless] search which is more intrusive or extensive than the earlier private search."[20]

In *United States v. Jacobsen*,[21] a majority of the Supreme Court adopted Justice Stevens's "scope of search" standard, holding that the Fourth Amendment is not implicated unless the government expands the scope of the prior search and uses "information with respect to which the expectation of privacy has nòt already been frustrated" by the private search.[22] "The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceed[ ] the scope of the private search."[23] In *Jacobsen*, Federal Express employees opened a damaged package and discovered a suspiciously wrapped quantity of white powder.[24] They resealed the package and notified the Drug Enforcement Agency (DEA).[25] When the DEA agent arrived, he opened the package, conducted a field test on the powder, and determined it to be cocaine.[26]

The Supreme Court held that the government's actions in reopening the package did not infringe on Jacobsen's Fourth Amendment rights because the government confined its search to the scope of the prior private search.[27] The Federal Express employees had destroyed any privacy interest Jacobsen had in the package.[28]

> [T]he removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of priva-

14. *Id.* at 661–62, 100 S.Ct. at 2404 (White, J., concurring).

15. *Id.* at 660–61, 100 S.Ct. at 2403–04 (White, J., concurring).

16. *Id.* at 661, 100 S.Ct. at 2404 (White, J., concurring).

17. *Id.* at 660–61, 100 S.Ct. at 2403–04 (White, J., concurring).

18. *Id.* at 663–66, 100 S.Ct. at 2404–06 (Blackmun, J., dissenting).

19. *Id.* at 663–66, 100 S.Ct. at 2404–06 (Blackmun, J., dissenting).

20. 1 Wayne R. LaFave, *Search and Seizure* § 1.8(b), at 230 (3d ed.1996).

21. 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

22. *Id.* at 117, 104 S.Ct. at 1658–59.

23. *Id.* at 115, 104 S.Ct. at 1657.

24. *Id.* at 111, 104 S.Ct. at 1655.

25. *Id.*

26. *Id.* at 111–12, 104 S.Ct. at 1655.

27. *See id.* at 118–22, 104 S.Ct. at 1659–61.

28. *See id.* at 119, 104 S.Ct. at 1659–60.

cy and hence was not a "search" within the meaning of the Fourth Amendment.[29]

After *Walter* and *Jacobsen,* the test to determine the validity of a warrantless government search following a private search is the degree to which the government's invasion of the privacy interest exceeds the scope of the private search.[30]

In the present case, P.B. had taken the tape from Alfred Paul's bedroom and viewed it. He saw Paul engaging in sexual relations with C.P. Without rewinding the tape, Officer Augustus placed the tape in a VCR and saw C.P. performing fellatio on Alfred Paul. Judge Zervos found that this activity was the same activity that P.B. had previously observed.

Paul argues that the Sitka Police violated his rights because Detective Widmier watched the entire tape and, therefore, expanded P.B.'s original search. Judge Zervos concluded that Detective Widmier's viewing of the videotape exceeded P.B.'s viewing "in only the most technical sense." He concluded that Detective Widmier's viewing "of the same people doing the same sort of acts on the same videotape that had already been viewed by private parties does not compromise any privacy interest that had not already been compromised." This view seems sound and appears consistent with *Jacobsen.*

In *Jacobsen,* the court allowed the police to search all of the bags which contained cocaine in the packages and to test it.[31] The court did not require the police to show that they had only opened the same cocaine bag that the private parties had previously opened. But even if we were to conclude that Detective Widmier's viewing of the entire tape was improper, it would still not lead to suppression of the evidence against Paul. Judge Zervos found that the police would have obtained a warrant based solely on the information available to them before Detective Widmier viewed the tape. This finding is fully supported by the record.

Paul points out that P.B. told the police that he had broken into his bedroom and had stolen the videotape in order to view it and give it to the police. He argues that the police viewing of the videotape was unconstitutional because of P.B.'s illegal actions. He relies on *Erickson v. State,*[32] a case decided by the Alaska Supreme Court. In Erickson, a police informant had seen the defendant place drugs in a suitcase.[33] The informant recovered the suitcase from its hiding place outside and brought it to the police station.[34] The suitcase was locked.[35] The informant told the police that he had seen the defendant place the drugs in the suitcase, but he had not searched the suitcase before turning it over to the police.[36] The police opened the suitcase without getting a warrant.[37] The Alaska Supreme Court held that the police needed a warrant to search the locked suitcase.[38] The *Erickson* decision appears to be consistent with *Jacobsen.* Because the informant had not previously searched the suitcase, the police substantially exceeded the earlier intrusion, i.e., the seizure of the suitcase. The defendant in Erickson retained a reasonable expectation of privacy in the contents of the suitcase. But in Erickson, the Supreme Court never addressed the issue of whether the informant's seizure of the suitcase was unlawful.[39] Therefore, Erickson does not support Paul's argument.

**29.** *Id.* at 120, 104 S.Ct. at 1660 (footnote omitted).

**30.** *Id.* at 115, 104 S.Ct. at 1657; *Staats v. State,* 717 P.2d 413, 421 (Alaska App.1986); *see also Stange v. State,* 559 P.2d 650, 655 (Alaska 1977) (reaching similar holding under plain view doctrine); *State v. Stump,* 547 P.2d 305, 307–08 (Alaska 1976) (same).

**31.** *Jacobsen,* 466 U.S. at 112, 104 S.Ct. at 1655.

**32.** 507 P.2d 508 (Alaska 1973).

**33.** *Id.* at 511.

**34.** *Id.* at 512.

**35.** *Id.*

**36.** *See id.* at 511–12.

**37.** *Id.* at 512.

**38.** *Id.* at 513.

**39.** *See id.* at 513.

Paul also relies on *State v. Miggler*.[40] In *Miggler*, the Minnesota Court of Appeals distinguished *Jacobsen* because: the private search of a locked footlocker was conducted in the defendant's home; Miggler had not entrusted the locked footlocker to anyone; the private searchers had broken into the footlocker; the police exceeded the scope of the private search; and, Miggler retained a privacy expectation in the non-contraband items in the footlocker.[41] The court held that the fruits of the search were inadmissible because the private searchers had no authority to admit the police into the residence, and the contraband was not discovered inadvertently or in plain view.[42] Miggler therefore turns on the fact that the police directly participated in an illegal search of the defendant's residence. No such intrusion occurred in the present case, and, therefore, Miggler is distinguishable.

█ It is true that the *Jacobsen* decision did point out that the private parties lawfully possessed the searched package.[43] But the case did not rely on the lawful possession of the package.[44] Cases applying the prior private search exception to the warrant requirement do not limit the doctrine to private searches of legally possessed items.[45] As the Supreme Court explained in *Walter*, "[i]t has, of course, been settled since *Burdeau v. McDowell*[, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921)], that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully."[46] Therefore, Paul's argument that the videotape should be sup-

pressed because P.B. had unlawfully seized it fails.

*Conclusion*

We conclude that Judge Zervos did not err in refusing to suppress evidence which the police obtained from viewing the videotape. We accordingly AFFIRM Paul's convictions.

40. 419 N.W.2d 81 (Minn.App.1988).

41. *See id.* at 83–85.

42. *Id.* at 85–86; *see also State v. Miller*, 110 Nev. 690, 877 P.2d 1044, 1049–51 (1994) (Young, J., dissenting) (citing *Miggler* as distinguishing *Jacobsen* on grounds that police entered the home of a suspect to reenact a search conducted by a private individual).

43. *Jacobsen*, 466 U.S. at 120 n. 17, 104 S.Ct. at 1660 n. 17.

44. *Id.*

45. *See, e.g., Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980); *United States v. Snowadzki*, 723 F.2d 1427, 1429–30 (9th Cir.1984) (government did not "search" stolen documents when it read documents because informant had privately searched the documents and turned them over to the police); *State v. Christensen*, 244 Mont. 312, 797 P.2d 893, 895–97 (1990) (evidence admissible even though given to police by burglars who had stolen it from defendant).

46. *Walter*, 447 U.S. at 656, 100 S.Ct. at 2401 (citations omitted).