Lowy, David A., J.
The defendant, James Raboin (Raboin), is charged with five counts of rape of a child, three counts of indecent assault and battery on a child under fourteen, six counts of posing or exhibiting a child in a state of nudity, and one count of administering a drug in order to have sexual intercourse. He now moves to suppress DVD and mini-cassette evidence that a private individual turned over to the Lawrence Police Department and which the police viewed in their entirety without a warrant. After hearing, and based on the findings of fact and conclusions of law discussed below, the defendant’s motion to suppress is DENIED.
FINDINGS OF FACT
In the afternoon of April 24, 2006, three minors broke into the defendant’s apartment. The minors discovered a tan or white-colored lockbox. They placed it in a bookbag and brought it home with them. The lockbox contained jeweliy, scratch tickets, and DVDs. The two minor boys began putting the DVDs into the DVD player to watch them. The minor girl intermittently watched a total of two to three minutes of at least one DVD. During her brief viewing, the minor girl observed another minor girl (her close friend) engaging in oral sex with the defendant, yet another minor girl sleeping, and herself modeling.
On that same date, Lawrence Police Officer William Green was called to the defendant’s apartment in a three-stoiy multi-unit building based on a report of a past breaking and entering. At that time, the defendant reported to him that a laptop computer, projector, video camera, and a lockbox containing videos, personal papers, photographs, and $400 had been stolen.
Sometime after April 24th, Rosa Cintron (Cintron), the mother of one of the minor children, gave Jose Rosario (Rosario) a plastic bag containing a number of DVDs and mini-cassettes. Cintron asked Rosario to view them and see if her daughters were on any of the DVDs. Rosario went home and began viewing the DVDs on a standard DVD player. He testified that he watched three or four of the DVDs “(b)ecause the other ones had ... the same name printed on them.” Rosario did not watch the DVDs in their entirety from start to finish. Instead, he would watch ten, fifteen, or thirty seconds, but no more than one minute at a time, then skip forward, then watch more. On all the DVDs he watched, Rosario observed the same adult male (later identified as the defendant) engaging in sexual activities in various scenes with two different minor girls. He did not see Cintron’s daughters. Rosario testified that he watched the DVDs for a total of fifteen minutes. He then immediately went to the Lawrence Police Department.
When Rosario arrived at the police department, he asked to speak with a detective and stated he had “something they need(ed) to see.” The front desk dispatcher called Detective Gene Hatem (Detective Hatem), who escorted Rosario to his office. Rosario handed him one of the DVDs he had previously seen. He directed Detective Hatem to “play this DVD” and told him he was “going to see a girl that’s underage being molested.” Rosario explained to Detective Hatem the sequence of events that led to him having the DVDs in his possession. When the detective put the DVD into the player, Rosario told him “keep fast-forwarding till you’re going to see something.” Rosario viewed three to five minutes of that one DVD with the detective.
After viewing a portion of the DVD with Rosario, Detective Hatem retained all the DVDs and mini-cassettes as evidence. Rosario brought a total of ten DVDs and thirteen mini-cassettes to the Lawrence Police Department. The DVDs were all gold, Maxell brand DVD-Rs in clear plastic cases. Each had a title written directly on the DVD surface in black marker:
DVD Number One: “My Shit 3"
DVD Number Two: “My Shit 2"
DVD Number Three: “Thumb 1"
DVD Number Four: “FEL-01 04/05"
DVD Number Five: “My Porn Pics”
DVD Number Six: “My Porn Pics”
DVD Number Seven: “My Shit 3"
DVD Number Eight: “FEL-01 04/05"
DVD Number Nine: “FEL-02 04/05"
DVD Number Ten: “FEL-02 04/05"
Thus, there were six different DVD titles. DVD Number Three is set up as movie. The opening screen displays the title: “Thumb Sucker.” It is credited to “Two Lips Productions” and “Johnnie Long.” It then states “Introducing Felicia Taylor in Thumb Sucker.”
Detective Hatem then contacted Lieutenant Mary Bartlett, who handles sexual assault cases. When Lieutenant Bartlett arrived, Detective Hatem showed her the same DVD he had viewed with Rosario. Rosario remained at the station while Lieutenant Bartlett viewed the DVD.
Later that week, Lieutenant Bartlett and another officer viewed all the DVDs and then the mini-cassettes. Lieutenant Bartlett would look at the titles before viewing each DVD. The mini-cassettes contained the same video as on the DVDs, but also included audio. The audio includes one of the minor girls and Raboin talking. In Mini-Cassette Number One, the minor girl indicates that she has just shut off a computer webcam so that a third party will not complain again. Raboin also asks her to put on sunglasses so “they” cannot tell who she is. An inference can thus be drawn from Mini-Cassette Number One’s *280 audio that Raboin was broadcasting the scenes over the internet.
RULINGS OF LAW
The Fourth Amendment to the United States Constitution protects the “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV. Similarly, under Article 14 of the Massachusetts Declaration of Rights, every person “has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions.” Mass. Const. Part I, art. XTV. Under the exclusionary rule, “all evidence obtained by searches and seizures in violation of the Constitution is . .. inadmissible in a state court.” Mapp v. Ohio, 367 U.S. 643, 655 (1961).
A. Expectation of Privacy
A necessary prerequisite to the application of the exclusionary rule is that the defendant must establish that “a search in the constitutional sense has occurred.” Commonwealth v. Nattoo, 70 MassApp.Ct. 625, 630 (2007) (citing Commonwealth v. D’Onofrio, 396 Mass. 711, 714 (1986)). Such a search requires that the defendant manifest a subjective expectation of privacy in the item(s) searched and that the defendant’s expectation of privacy be one that society is willing to recognize as reasonable. See id.; see also Minnesota v. Carter, 525 U.S. 83, 88 (1998); Commonwealth v. Bly, 448 Mass. 473, 490-91 (2007) (rejecting defendant’s claim that he had a subjective expectation of privacy in his cigarette butts and water bottle when he took no action to manifest any expectation of privacy in them).
Here, Raboin contends that he had a subjective expectation of privacy in the DVDs and mini-cassettes. He manifested his subjective expectation by storing the DVDs and mini-cassettes in a lockbox with other valuables. Cf. Bly, 448 Mass. at 490-91 (when police escorted defendant to make a telephone call, defendant made no attempt to take items with him when he left the interrogation room). The court, therefore, must determine whether Raboin’s subjective expectation of privacy in the DVDs and mini-cassettes is one that society is prepared to recognize as reasonable. See Nattoo, 70 MassApp.Ct. at 630.
1. Reporting that the Items were Stolen
The Commonwealth argues that any reasonable expectation of privacy Raboin may have had in the lockbox was destroyed when he reported its contents stolen. Other state courts that have addressed searches of lost property have uniformly held that persons retain a reasonable expectation of privacy in personal property that is lost or mislaid “diminished to the extent that the finder may examine the contents of that item as necessary to determine the rightful owner.” See State v. Hamilton, 67 P.3d 871, 875 (Mont. 2002); see also State v. Kealey, 907 P.2d 319, 325-26 (Wash.Ct.App. 1995) (holding that an owner’s reasonable expectation of privacy in lost property “is diminished . . . by the fact that the finder . . . has an obligation to seek out the owner of the goods and to try to return them”); State v. Ching, 678 P.2d 1088, 1092-93 (Haw. 1984) (holding that “police may validly search lost properly to the extent necessary for identification purposes”). For example, in Hamilton, a wallet containing two compartments and a zippered coin purse was turned over to the police. 67 P.2d at 873. The right compartment had a plastic window with the defendant’s license and the left compartment held her checkbook, which stated her phone number and address. Id. The police searched the entire wallet, including the zippered coin purse, and discovered drugs. Id. The Montana Supreme Court held that the police went too far when they opened the wallet’s coin purse because the defendant’s driver’s license and checkbook were all they needed to determine that the defendant owned the wallet. Id. at 879.
There is also support in the First Circuit for the proposition that an owner of lost or stolen property retains a diminished expectation of privacy. See United States v. Procopio, 88 F.3d 21, 26 (1st Cir. 1996), cert. denied, 519 U.S. 1138 (1997). In Procopio, the defendant stored documents in a safe, which was subsequently stolen and discovered by the police in a park. Id. The First Circuit upheld the police’s warrantless search of the safe, stating that “any reasonable expectation of privacy [the defendant] enjoyed in documents secured in . . . [the] safe was destroyed by private action for which the government was not responsible.” Id. (citing Jacobsen, 466 U.S. at 113).
Here, the DVDs and mini-cassettes contained no information on their outsides indicating their ownership. Thus, like a wallet, the DVDs’ and mini-cassettes’ ownership can only be determined by looking inside for identification. See Hamilton, 67 P.3d at 875. Accordingly, Raboin’s reasonable expectation of privacy in the DVDs and mini-cassettes was diminished to the extent that a reasonable person could anticipate that a third party would view them for purposes of determining who they belonged to. See id; see also Procopio, 88 F.3d at 26; Kealey, 907 P.2d at 325-26; Ching, 678 P.2d at 1092-93. Once a third party presses “play” on either the DVDs or mini-cassettes, Raboin’s illegal actions are immediately apparent. Cf. Hamilton, 67 P.2d at 879 (after opening wallet, illegal drugs still hidden in zippered change purse). Consequently, Raboin’s subjective expectation that the police or any other persons who discovered the stolen DVDs and mini-cassettes would not view at least a portion of them to determine their owner is not one that society is prepared to recognize as reasonable. See Nattoo, 70 MassApp.Ct. at 630; see also Procopio, 88 F.3d at 26; Kealey, 907 P.2d at 325-26; Ching, 678 P.2d at 1092-93.
2. Stay-Away Order
At the time of the events at issue Raboin was subj ect to a stay-away order as a result of a domestic dispute *281 with Marie Jacques. The Commonwealth thus alternatively argues that Raboin could have no reasonable expectation of privacy in the items stolen from the apartment because he had no right to be there.
Commonwealth v. Morrison, 429 Mass. 511, 511-14 (1999), provides a factually similar analogy to the case at bar. In Morrison, the police responded to a report of shouting between the defendant and a pregnant woman and were advised that the woman had a protective order against him. Id. at 511-12. When the police arrived, the defendant “disclaimed any knowledge of the protective order.” Id. The police then advised him of the order and warned him that he would be arrested if he had any future contact with the woman. Id. Later that evening, the police responded to another report involving the same couple. Id. The police found the defendant in the bedroom of the woman’s apartment and arrested him. Id. at 513. The defendant moved to suppress all evidence seized during the police’s warrantless entry into the apartment. Id. at 511. The Supreme Judicial Court recognized that the defendant appeared to be an overnight guest, and thus, would ordinarily have an expectation of privacy in the apartment that society would consider reasonable. Id. at 513-14 (citing Minnesota v. Olsen, 495 U.S. 91, 95-96 (1990)). The Court, however, refused to suppress the evidence, holding that the protective order rendered the defendant’s expectation of privacy in the apartment unreasonable. Id. at 514. The Court reasoned that “[i]t is simply nonsense to say that society is prepared to recognize the right to be where society by processes of law has ordered [the defendant] not to be.” Id. at 514; see also United States v. Rambo, 789 F.2d 1289, 1296 (8th Cir. 1996) (stating that defendant “cannot assert an expectation of... privacy in a place from which he has been justifiably expelled”); United States v. Brown, 484 F.Sup. 2d 985, 992 (D.Minn. 2007) (holding that even though defendant was apartment tenant’s overnight guest, he had no expectation of privacy in the apartment because security had previously banned him from the apartment complex); State v. Oien, 717 N.W.2d 593, 597-98 (N.D. 2003) (stating that defendant had no reasonable expectation of privacy even though overnight guest in apartment because landlord had sent him a “no trespass” order). Accordingly, Raboin’s stay-away order provides an additional reason why his subjective expectation of privacy in the lockbox’s contents is not a reasonable one. See id.
3. DVDs as Movie Production and Indication of Internet Dissemination
“What a person knowingly exposes to the public, even in his own home ... is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967); see also United States v. Taylor, 683 F.2d 18, 21 (1st Cir. 1982) (holding that defendant had no reasonable expectation of privacy in film roll depicting illegal activity that he brought to a commercial establishment for development), cert. denied, 459 U.S. 945 (1982). Here, Raboin “knowingly expose[d]” his illegal actions to the public by broadcasting them on the internet using a webcam. See Katz, 389 U.S. at 351. Although the evidence does not indicate that Raboin broadcast all the acts depicted on the DVDs and mini-cassettes at the time he committed them, the content of DVD Number One, labeled “Thumb 1,” indicates his intent to do so. DVD Number One is set up as a movie, as the title screen states “Two Lips Productions.” The fact that Raboin may have only intended persons who condoned his illegal actions to view them is of no consequence. See Maryland v. Macon, 472 U.S. 463, 469 (1985). “The mere expectation that the . . . illegal nature of a product will not come to the attention of the authorities ... is not one that society is prepared to recognize as reasonable.” Macon, 472 U.S. at 469 (holding that defendant had no reasonable expectation of privacy in obscene magazine where he made it available to the public in his bookstore). Thus, Raboin cannot have a reasonable expectation of privacy in items he disseminated (or intended to disseminate) to third parties. See id.
Consequently, there are three alternative theories upon which the court can determine that Raboin retained no reasonable expectation of privacy in the DVDs and mini-cassettes: (1) that Raboin reported the DVDs and mini-cassettes stolen; (2) that he was not legally permitted to be in the apartment from which the minor children stole the lockbox; and (3) that Raboin did and/or intended to make his actions available to the public. Accordingly, Raboin’s motion to suppress should be denied on this basis alone. See e.g., Nattoo, 70 Mass.App.Ct. at 630.
B. Government Action Requirement and the Private Search Doctrine
The Commonwealth alternatively argues that no search in the constitutional sense occurred because private individuals discovered the DVDs and mini-cassettes and reported their contents to the police. The exclusionary rule barring searches in violation of the Fourth Amendment requires government action. Coolidge v. New Hampshire, 403 U.S. 443, 488 (1971) (stating that the exclusionary rule’s “target is official misconduct”). Fourth Amendment restrictions are “wholly inapplicable ‘to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official.’ ” United States v. Jacobsen, 466 U.S. 109, 113-14 (1984) (quoting Walter v. United States, 447 U.S. 649, 662 (1980) (Blackmun J., dissenting)).
Thus, even evidence that private individuals obtain illegally is admissible. Burdeau v. McDowell, 256 U.S. 465, 475 (1921); see also Dist. Attorney for the Plymouth Dist. v. Coffey, 386 Mass. 218, 221 (1982) (“evidence illegally obtained by private parties and turned over to the police is not a violation of the Fourth *282 Amendment”). [T]he policy underlying the Fourth and Fourteenth Amendment [is not intended] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." Coolidge, 403 U.S. at 488. Accordingly, any evidence that the minors who burglarized the defendant’s home viewed or Rosario viewed must be admissible as they were mere “private individual[s]” and Raboin does not argue that they were “acting as . . . agent[s] of the government or with participation or knowledge of any government official.” Jacobsen, 466 U.S. at 113-14. The government, however, “may not exceed the scope of the private search unless it has a right to make an independent search.” Walter, 447 U.S. at 657. The major issue therefore presented is whether, to the extent that Raboin retained any reasonable expectation of privacy in the DVDs and mini-cassettes, the police’s viewing of the additional video evidence without a warrant impermis-sibly “exceeded the scope” of the private individual’s search. Jacobsen, 466 U.S. at 115.
The United States Supreme Court addressed the circumstances under which a government official exceeds the scope of a private individual’s search in 1980 in Walter, 447 U.S. at 651-52, and in 1984 in Jacobsen, 466 U.S. at 115. In Walter, twelve, “large, securely sealed packages containing 871 boxes of 8-millimeter film” were delivered via private charter to the wrong address. 447 U.S. at 651. The boxes’ sides had “suggestive drawings” and an “explicit description of the contents.” Id. at 652. Employees opened each of the twelve packages and “attempted without success to view portions of the film by holding it up the light.” Id. The employees contacted the FBI, who viewed the films via a projector without a search warrant. Id.
A plurality of the Walter Court held that the FBI’s “projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search.” Id. at 657. The Court reasoned that the film’s contents were not in plain view when presented to the police and thus, prior to their projection, “one could only draw inferences about what was on” them.[1] Id. The plurality rejected the government’s argument that by opening the box and exposing the film’s descriptive labels, the private individuals frustrated the defendant’s expectation of privacy in the film’s contents. Id. at 658-59. The plurality stated that “[t]he private search merely frustrated that expectation in part.” Id. at 659. The dissent, however, appeared to agree with the government’s position. See id. Justice Blackmun, dissenting, stated that the boxes’ explicit sides “clearly revealed the nature of their contents.” Id. at 663. He further stated that by the time the FBI viewed the films, “[a]ny subjective expectation of privacy on the part of the petitioners was undone ... by their own actions [in providing a fictitious shipper and addressee] and the private search.” Id. at 655. Massachusetts courts have, in fact, been skeptical of Walter’s continued application. See e.g., Commonwealth v. Varney, 391 Mass. 34, 40-41 (1984) (distinguishing Walter as relying heavily on fact that the films were potentially protected by the First Amendment); Commonwealth v. Aviles, Cr. No. 188-93 (Essex Super. Ct. May 2, 1999) (Welch, J.) [10 Mass. L. Rptr. 121] (“The Walter plurality opinion has not exhibited a vibrant longevity”).
In Jacobsen, the Supreme Court confronted a factual situation in which Federal Express employees opened a damaged package to inspect its contents pursuant to company policy. 466 U.S. at 111. The box contained a tube covered by newspapers and filled with a “series of four zip-lock plastic bags, the outermost enclosing the other three and the innermost containing . . . white powder.” Id. Upon seeing the white powder, the employees rewrapped the package and contacted the Drug Enforcement Administration. Id. An agent arrived, re-opened the package, and examined its contents. Id. The agent then slit the plastic bags open and conducted a drug field test on the powder. Id. The Court held that the agent’s reopening of the package and visual inspection of its contents did not constitute a search within the meaning of the Fourth Amendment because it “enabled the agent to learn nothing that had not previously been learned during the private search.” Id. at 120. The Court also upheld the field test because a “chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.” Id. at 123.
This topic has not been addressed in Massachusetts, or the First Circuit, since the Supreme Court decided Walter and Jacobsen in the early 1980s. The circuit courts and other states, however, provide factually similar, relevant, and recent guidance on how best to resolve this matter within the bounds of the Fourth Amendment. See e.g., United States v. Slanina, 283 F.3d 670 (5th Cir. 2002), vacated on other grounds, 537 U.S. 802 (2002); United States v. Runyan, 275 F.3d 449 (5th Cir. 2001); State v. Robinson, 653 S.E.2d 889 (S.C. Ct.App. 2007); Paul v. State, 57 P.3d 698 (Alaska Ct.App. 2002).[2]
1. Government’s Viewing of Entire DVD Where Private Individuals Only Viewed Select Segments
Raboin argues that the police impermissibly exceeded the scope of the private individuals’ search when they viewed entire DVDs of which Rosario and the minors had only viewed portions. “[T]he police do not exceed the scope of a prior private search when they examine the same materials that were examined by the private searchers, but they examine [those] materials more thoroughly.” Runyan, 275 F.3d at 464; see also United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990) (holding that government’s search of box containing child pornography did not exceed the private search’s scope “simply because they took more time and were more thorough than the” private individuals); United States v. Oliver, 3:07-CR-380-D 2008 *283 (N.D. Tex. 2008), 2008WL 1849010 (“Even if [the private individual] did not conduct a page-by-page examination of the notebook . . . the agents’ subsequent detailed search of each page . .. did not exceed the scope of [the private individual’s] search.”). For example, in Slanina, private individuals searched the defendant’s computer hard drive and zip drive for two hours and discovered child pornography. 283 F.3d at 672-73. The FBI then conducted a complete search of the hard drive and zip drive. Id at 674-75. The Fifth Circuit held that:
the FBI’s full search of the computer equipment, which had already been partially searched by [the private individual] did not run afoul of the Fourth Amendment. Once [the private individual] looked at the computer and zip disk, Slanina’s expectation of privacy in them had already been eroded. He could not then complain about the FBI search of the same materials even though the FBI may have looked at more files.
Id at 680.
State courts that have addressed this factual situation have utilized the same reasoning. See Robinson, 653 S.E.2d at 892; Paul, 57 P.2d at 702. In Robinson, aprivate individual opened the defendant’s lockbox using stolen keys and removed a videotape. 653 S.E.2d at 890. He “watched portions of the tape” and observed minors engaging in sexual activities. Id He contacted the police, who then viewed the entire videotape at the police department. Id Relying on Runyan and Simpson, the South Carolina Court of Appeals upheld the entire videotape’s admission into evidence. Id at 892 (citing Runyan, 275 F.3d at 464; Simpson, 904 F.2d at 610). The court reasoned that “[w]hile [the private individual] stated that he had only viewed ‘portions’ of the videotape, his viewing ‘opened the container’ of the videotape and the subsequent viewing of the entire tape was not outside the scope of the [private individual’s] initial ‘search.’ ” Id.(citing Runyan, 275 F.3d at 465).
Similarly, in Paul, a private individual broke into the defendant’s bedroom and watched a few minutes of an eight-hour videotape depicting the defendant engaging in sexual acts with a minor. 57 P.3d at 699. The private individual turned the tape over to the police, who viewed it in its entirety without a warrant. Id The Alaska Court of Appeals upheld the trial judge’s determination that the police’s viewing of the videotape “exceeded [the private individual’s] viewing in only the most technical sense” as the police’s viewing was “of the same people doing the same sorts of acts on the same videotape that had already been viewed by private parties.” Id at 702.
Consequently, although Rosario only watched portions of three to four DVDs and the minor only watched two to three minutes of one DVD, their viewing “opened the container” of each DVD they watched. See Robinson, 653 S.E.2d at 892. Rosario was able to ascertain by a brief viewing that the DVDs depicted illegal acts and, logically, was uncomfortable with viewing more than necessary to determine this. Likewise, the minor saw her friend on the DVD and was uncomfortable with watching more. Thus, when the police watched each of those DVDs in their entirety, Raboin’s expectation of privacy in them “had already been eroded.” See Slanina, 283 F.3d at 680. The police merely viewed the “same people doing the same sorts of acts on the same [DVDs] that had already been viewed by private parties.” See Paul, 57 P.3d at 702. The fact that the police, understandably, “took more time and were more thorough than” Rosario and the minor does not result in a Fourth Amendment violation. See Simpson 904 F.2d at 610.
Rosario’s conduct in reporting these serious illegal acts to the police was commendable. Suppressing the evidence that Rosario discovered based on the mere fact that he sought to limit his viewing of these distressing and vile images might well discourage other private citizens from taking such action in the future. See Coolidge, 403 U.S. at 488 (stating that “the policy underlying the Fourth . . . Amendment [is not intended] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals”). Accordingly, because Raboin retained no reasonable expectation of privacy in the DVDs (as discussed in Part A above) and because the police did not impermissibly exceed the scope of the private individuals’ searches, Raboin’s motion to suppress as to the DVDs that Rosario and the minor viewed shall be denied. See id.; see also Slanina, 283 F.3d at 672-75; Runyan 275 F.3d at 464; Paul 57 P.3d at 702; Robinson 653 S.E.2d at 890-92.
2. Government’s Viewing of DVDs That the Private Individuals Did Not View
Raboin also argues that the government impermissi-bly exceeded the scope of the private search when the police viewed DVDs that Rosario and the minor did not view. In Runyan the Fifth Circuit held that the police impermissibly exceeded the scope of the private individual’s search because “[t]he police could not have concluded with substantial certainty that all of the disks contained child pornography based on knowledge gained from the private searchers, information in plain view, or their own expertise.”[3] 275 F.3d at 464. In Runyan, the private individual was divorcing the defendant and broke into his house to retrieve her belongings. Id at 452-53. She discovered the disks-at-issue “lying on the floor surrounding the computer” and there “was nothing on the outside of any disk indicating its contents.” Id at 453, 464. Additionally, some disks did not contain any child pornography. Id at 464 n. 16. Here, by contrast, all the DVDs were discovered in the same lockbox, were the same recordable DVD brand name, and had similar names written in black ink on each DVD’s surface. In fact, four of the DVDs appeared to be copies of four others as they had identical names. Additionally, DVD Numbers One, Two, and Seven and DVD Numbers Four, Eight, Nine, and Ten have the same name and only differ by one number, suggesting that they are part of a series. Finally, DVD Numbers Five and Six are explicitly titled “My Pom Pics.” See id. Thus, the police could conclude “with substantial certainty that all of the [DVDs] con *284 tained child pornography” based on the information they learned from Rosario, the DVD’s labels, and then-expertise. See id. at 464.
United States v. Bowman, 907 F.2d 63, 64-65 (8th Cir. 1990), also provides a useful comparison. In Bowman, a private individual searched one of five “identical bundles wrapped in towels” and found white powder in plastic, id. at 64. The police then searched the other four bundles and conducted a drug test. Id. The court upheld the search without a warrant, stating that the defendant no longer had any expectation of privacy in the suitcase in which the private individuals found the bundles. Id. at 65. The court reasoned that the “presence of the cocaine in the exposed bundle ‘spoke volumes as to the contents of the remaining bundlesparticularly to the trained eye of the officer.’ ” Id. (quoting Jacobsen, 466 U.S. at 121).
Like the identical bundles in Bowman, DVD Numbers Four and Eight, Five and Six, and Nine and Ten have identical titles and DVD Numbers One, Two, and Seven have similar titles bearing consecutive numbers. See id. Thus, the DVD names and the fact that Rosario chose three to four DVDs at random, and those randomly-picked DVDs all depicted sexual activities with the same minor, “spoke volumes as to the contents of the remaining” DVDs. See id. Rosario, in fact, testified that he did not view the DVDs with the same titles because he assumed they were copies and, therefore, there was no need to look for them. Moreover, Rosario’s judgment that he had seen enough to go to the police after his short viewing signifies that he recognized what was most likely on the remainder of the DVDs and mini-cassettes. See id.
The police, therefore, did not exceed the scope of the private individuals’ search when they viewed more DVDs originally discovered in the same lockbox than Rosario and the minors viewed. See id.; see also Runyan, 275 F.3d at 464. Accordingly, because Raboin retained no reasonable expectation of privacy in the DVDs and because the police did not impermis-sibly exceed the scope of the private individuals’ search, Raboin’s motion to suppress the remainder of the DVD evidence must be denied. See id.
3. Government’s Viewing of the Mini-Cassettes
Finally, the defendant seeks to suppress the thirteen mini-cassettes. The mini-cassettes contain the same visual content as the DVDs, but also include audio. Thus, to the extent that Raboin retained a reasonable expectation of privacy in the mini-cassettes, it “had already been eroded” by the private individual’s viewing of the same content on the DVDs. See Slanina, 283 F.3d at 680. Thus, the issue presented is whether the police impermissibly expanded the scope of the private individuals’ searches when they heard audio on the mini-cassettes that was not on the DVDs.
Rosario did not view any of the mini-cassettes because he did not possess the proper equipment. Like the DVDs, the minors found the mini-cassettes in the same lockbox. The DVDs and the mini-cassettes were the only media equipment in the lockbox. The court takes judicial notice that DVD-Rs and mini-cassettes are similar media equipment in that they are both items that are typically purchased blank and recorded on by the purchaser. See United States v. Hoyts Cinemas Corp., 256 F.Sup.2d 73, 81 (D.Mass. 2003) (stating that expert report not required and taking judicial notice that patrons tend to avoid front rows of movie theater); Pump, Inc. v. Collins Mgmt., 746 F.Sup. 1159, 1169 n.15 (D.Mass. 1990) (taking judicial notice that “compact discs and records are relatively inexpensive goods that are most often purchased by the casual purchaser without careful consideration).
The police viewed the mini-cassettes after watching all the DVDs. Thus, given that all the DVDs contained illegal sexual acts involving the defendant and the same two minors, and the fact that the DVDs and mini-cassettes were all similar recordable media equipment, the police could determine with “substantial certainty” that the mini-cassettes contained the same illegal material. See Runyan, 275 F.3d at 464. Thus, the police did not impermissibly exceed the scope of the private individuals’ searches when they viewed the mini-cassettes. See id.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to suppress be DENIED.

 It should be noted that the Walter plurality was also conscious of the First Amendment’s potential application: “When the contents of the package are books or other materials arguably protected by the First Amendment, and when the basis for the seizure is disapproval of the message contained therein, it is especially important that [the warrant] requirement be scrupulously observed.” 447 U.S. at 655. The Court, in a footnote, also quoted Marcus v. Search Warrant, 367 U.S. 717, 724 (1960): “[t]he use by the government of the power of a search and seizure as an adjunct to a system for the suppression of objectionable publications is not new.” Id. at 655 n.6.

 In the Slanina appeal, the Supreme Court vacated and remanded the defendant’s conviction for consideration in light of Ashcroft v. Free Speech Coal., 535 U.S. 234 (2002), 537 U.S. at 802. In Free Speech Coalition, the Supreme Court held portions of the Child Pornography Act of 1986 overbroad and unconstitutional because they did not distinguish' between images using real children and virtual ones. 535 U.S. at 256, 258. On remand, the district court determined that the defendant’s conviction was based on validated portions of the statute. See United States v. Slanina 359 F.3d 356, 357 (5th Cir. 2004). The defendant again appealed that decision and the district court’s refusal to suppress evidence. Id. The Fifth Circuit refused to reconsider its decision affirming the district court’s denial of the motion to suppress based on the private search doctrine. Id. at 358, cert. denied, 543 U.S. 845 (2004).

 The Fifth Circuit remanded for the district court to engage in further fact-finding. Runyan, 275 F.3d at 452. After such findings, the Fifth Circuit held the evidence admissible under the independent source doctrine. United States v. Runyan, 290 F.3d 223, 237 (2002), cert. denied, 537 U.S. 888 (2002).